Linda Marie ZAMBRANO, Plaintiff,

and

Jose E. Tafolla, Esq.; Philip W. Orr, Esq., Claimants–Appellants,

v.

CITY OF TUSTIN; David Kreyling, Defendants–Appellees.

No. 88–5621.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 4, 1988.

Decided Sept. 21, 1989.

J. Manuel Sanchez, J. Manuel Sanchez & Associates, San Diego, Cal., for claimants-appellants.

Daniel K. Spradlin, Rourke and Woodruff, Orange, Cal., for defendants-appellees.

Before SCHROEDER and REINHARDT, Circuit Judges, and HARDY *, District Judge.

REINHARDT, Circuit Judge:

Attorneys Jose Tafolla and Philip Orr appeal sanctions levied against them for failure to comply with local rules requiring admission to the district court bar. We must decide whether, under the particular circumstances of the case before us, the district court overstepped the limits of its discretion in sanctioning appellants. Because we conclude that in this case it did, we vacate the order.

## I. *Factual Background*

This appeal stems from a § 1983 action filed by Linda Zambrano against the City of Tustin, California. From the very beginning, the trial proved to be an undignified affair. On the first day, Orr, representing the plaintiff, appeared twenty minutes past the scheduled hearing time; Judge Richard A. Gadbois, Jr., the presiding judge at trial, fined him $150.[1] Several minutes later, the Court severely chastised counsel for failing to rise when addressing the bench.[2] The

---

\* The Honorable Charles L. Hardy, United States District Judge for the District of Arizona, sitting by designation.

1. Orr does not appeal the sanction for appearing late for trial.

2. The Court: "You will please rise when you address the Court."

Mr. Orr: "I'm sorry, your Honor."

The Court: "There are some places in this building where you wouldn't get a second chance to remedy that problem; you'd be in the custody of the Marshal."

petty disputes not only marred the first day of trial, they also foreshadowed greater problems.

■ When Orr arrived punctually for trial the second day, Judge Gadbois announced that his investigation, conducted sua sponte, revealed that Orr was not a member of the Bar of the Central District and was therefore ineligible to practice before the Court. "You're not admitted to the Bar of this Court. Now, that doesn't strike you as being an impropriety of rather significant proportions? You know, that happened to ... [another judge in the Central District] ... in the very recent history ... and he held the lawyer who did what you've done in criminal contempt and had him put into leg irons and taken out of the courtroom."[3] After counsel confessed that he had inadvertently failed to comply with the enrollment requirements of Local Rule 2.1, Judge Gadbois ordered a recess with the expectation that Tafolla, who had initially represented the plaintiff and had arranged for Orr's participation at trial, would appear and assume responsibility for the trial. Instead, the Court discovered that Tafolla had also never been admitted to the Central District Bar, and, later that day, declared a mistrial.[4] The Court decreed that neither Orr nor Tafolla was qualified to practice and that there was no procedure that could remedy the situation. The court expressed the startling conclusion that Orr and Tafolla, both members of the California state bar and Southern District of California bar, were not "any more qualified than an auto mechanic" to conduct a trial.[5] Two weeks later, the district court issued an order to show cause and imposed sanctions consisting of costs for jury fees amounting to $2,217.88,[6] lawyers' fees for the defendants totaling $2,525, and $1,500 in accumulated expenses to compen-

3. Although Judge Gadbois cited this alleged episode as precedent, we can only assume that he is in error in his belief that another judge of the Central District shackled an attorney for a simple violation of a local rule.

4. Ms. Zambrano does not seek relief from the decision to declare a mistrial, and she is not a party to this appeal. We nonetheless add some cautionary words about dismissal. As a general rule, the minor problems created by counsel should not be visited upon the litigants. See *Miranda v. Southern Pacific Transportation Co.,* 710 F.2d 516, 520 (9th Cir.1983). Although, in this case, the dismissal was without prejudice to refiling, even that limited action could have a substantial effect on the course of litigation. We think in such a situation that the district court is under an affirmative obligation to explore alternative remedies to dismissal. *Cf. Toth v. Trans World Airway, Inc.,* 862 F.2d 1381, 1385 (9th Cir.1988). Both Orr and Tafolla are experienced attorneys and members in good standing of the California Bar and of the Bar of the Southern District of California. Although their failure to fulfill the requirements of Local Rule 2.1 reflects poorly upon them, nothing in the record suggests that either one could not have competently handled Ms. Zambrano's trial. Under these circumstances, the Court would have been well advised to allow Tafolla and/or Orr to seek admission to the Bar of the Central District before declaring a mistrial. Tafolla, on appeal, asserts that he had lawyers "standing by" to move his admission to the Bar. The accuracy of this statement can not be assessed, principally because the trial court acted so precipitously. The court's decision to declare a mistrial rather than seek alternative solutions apparently reflects a general exasperation with appellants. "I had no choice but to declare mistrial. I was in no mood to countenance admission now of either of these lawyers ..." Letter from Judge Gadbois to the Honorable Manual Real, Chief Judge of the Central District of California. While we might be able to sympathize with Judge Gadbois' frustration with appellants, penalizing the litigants serves as an improper outlet for those feelings.

5. Judge Gadbois subsequently returned to his leg irons motif. "Let me tell you, Mr. Orr, that if you file an application ever for admission to the Bar of this Court and don't disclose what's happened here in the last two days, believe me you'll be in criminal contempt of this Court. That's just a clear invitation to get the leg irons on you." If Judge Gadbois' threats were not idle, it bears repeating that use of restraints in this context would be dramatically inconsistent with established rules. If his statements were merely intended as hyperbole, and out of respect for the court we will presume they were, we would suggest that the record is generally better left uncluttered by such distractions.

6. While the jury fees were styled as a "cost," in this case they are, in reality, a sanction and were imposed as such. Jury expenses are normally borne by the judicial branch, *see* Local Rule 16.4, but here appellants were ordered to make payments to the Clerk of the Court. Consequently, we treat the jury fees as part of the Court's sanctions against appellants. *See Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 440, 107 S.Ct. 2494, 2496, 96 L.Ed.2d 385 (1987).

sate the judicial branch for being "badly used by counsel".

## II. *Jurisdiction*

Before we turn to the merits of the sanction order, we must first determine whether the order has been properly appealed. On December 14, 1987, Judge Gadbois issued an order assessing the $6,242.88 in sanctions and also providing that "[c]ounsel may seek a hearing on these matters before finality of the order." The court scheduled a hearing before the federal magistrate for the afternoon of December 18 and ordered that the fines be paid on December 23, presumably with the understanding that the sanctions could be altered if the magistrate so recommended before the payment date. Because the four-day preparation time for the December 18th hearing proved inadequate, appellants requested a continuance; the magistrate took the motion under submission and ultimately granted the request. A new hearing date was set for March 8, 1988. However, Judge Gadbois, on December 22, instead of delaying the payment date until after the March hearing, rescheduled the payment date for January 22. Appellants filed their notice of appeal—seeking, alternatively, relief from the sanctions or a right to a pre-deprivation hearing—on January 21.

In sum, the district court's directive of December 22 required appellants to submit a final, nonrefundable payment of the sanction within thirty days. *See* Fed.R. App.P. 4(a). Appellants were not afforded an adequate opportunity during the payment period to contest the order. While a hearing should have been held on the sanctions question prior to the time the order became final,[7] a hearing that takes place *after* the payment of sanctions and after a final order does not constitute a constitutionally adequate opportunity to be heard.[8] We therefore hold that the order of December 22 constituted a final order appealable within the statutory time limit. Since appellants filed their notice of appeal within that period, we have jurisdiction to hear their claim.

## III. *Discussion*

The part of the order imposing fines payable to the court and the portion requiring payment of attorneys' fees to the City of Tustin both constitute sanctions. However, they, at least in part, raise different legal issues and implicate different bodies of case law, and we consequently treat them separately. First, we discuss the propriety of the approximately $3700 in penalties payable to the court; in section B, we turn to the portion of the district court's order requiring the payment of attorneys' fees.

### A. *Sanctions Payable to the Court*

In determining the validity of any judicial sanction, we must first consider the underlying authority for the court's action. "For a sanction to be validly imposed, the conduct in question must be sanctionable under the authority relied on." *Cunningham v. County of Los Angeles*, 869 F.2d 427, 436 (9th Cir.1989) (quoting *McCabe v.*

---

**7.** As far as the appellate record indicates, the scheduled March hearing was never held. In any event, a March hearing would have been pointless since the filing of the appeal vested this court with jurisdiction over the case and deprived the district court of jurisdiction. *Davis v. United States*, 667 F.2d 822, 824 (9th Cir. 1982).

**8.** We have previously held that fundamental fairness requires a *pre*-deprivation hearing before the court may order sanctions. *See Miranda*, 710 F.2d at 523. "Absent extraordinary circumstances, procedural due process requires notice and a hearing before any governmental deprivation of a significant property interest." (emphasis added). *See also Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767, 100 S.Ct. 2455, 2464, 65 L.Ed.2d 488 (1980).

We have also held that a post-deprivation hearing is constitutionally inadequate in a wide variety of sanctions situations. *Tom Growney Equipment v. Shelley Irrigation Development, Inc.*, 834 F.2d 833 (9th Cir.1987) (Rule 11) ("we find that the subsequent hearing was also insufficient in providing appellant with procedural due process"); *T.W. Elec. Service, Inc. v. Pacific Electric Contractors*, 809 F.2d 626, 638 (9th Cir. 1987) ("Notice and a hearing should precede imposition of a sanction under [28 U.S.C.] § 1927"). *See also F.T.C. v. Alaska Land Leasing, Inc.*, 799 F.2d 507, 519 (9th Cir.1986); *Toombs v. Leone*, 777 F.2d 465 (9th Cir.1985). We can hardly fault appellants for not waiting for the hearing when the proffered hearing was both constitutionally inadequate and delay beyond January 22 risked running the statutory appeals clock.

*Arave*, 827 F.2d 634, 639 (9th Cir.1987)). In sanctioning Tafolla and Orr, the trial court explicitly acted under the aegis of local rules adopted by the judges of the Central District of California.[9] Local Rule 2.1 requires that any attorney appearing on behalf of a client before the district court be a member in good standing of the court's bar.[10] Local Rule 27.1 authorizes the trial judge to sanction a party or counsel for a wide range of transgressions. "The violation of or failure to conform to any of these Local Rules, the F.R.Civ.P., F.R.Crim.P. or F.R.App.P., shall subject the offending party or counsel to such penalties, including monetary sanctions and/or the imposition of costs and attorney's fees to opposing counsel, as the Court may deem appropriate under the circumstances."

We have consistently upheld the power of the district court to sanction attorneys for violations of local rules. *See, e.g., United States v. Summet*, 862 F.2d 784, 786 (9th Cir.1988). Although district courts frequently sanction members of their bar under the authority of such rules, we may have been somewhat remiss in not defining the source of the court's authority, drawing the precise contours of that power, or establishing rules to guide trial courts in the exercise of their discretion.

The power of the federal courts to sanction parties and counsel has been a subject of intense debate. In *Gamble v. Pope & Talbot, Inc.*, 307 F.2d 729 (3d Cir.) (en banc), *cert. denied*, 371 U.S. 888, 83 S.Ct. 187, 9 L.Ed.2d 123 (1962), the Third Circuit held that a federal district court lacked the power to sanction counsel for violations of a "standing order" of the Eastern District of Pennsylvania. The majority, over a vigorous dissent by Chief Judge Biggs, reasoned that the fine was a criminal penalty and that the power to assess criminal punishment was strictly a legislative, not a judicial, function. *Id.* at 733. In dissent, the Chief Judge argued that miscreant attorneys posed a substantial hazard to the fair and orderly administration of justice. "The often unconscious mental attitudes of this small group [of attorneys] contributes substantially to calendar congestion. It is the banal but brutal fact that justice delayed is justice denied." *Id.* at 734. Chief Judge Biggs argued that sanctioning counsel—rather than visiting the more serious penalty of dismissal upon the litigant[11]—was an appropriate and reasonable solution to the problems engendered by repeated lawyer misconduct. This power, the dissent argued, was consistent with both the separation of powers and Congress' delegation of authority to the federal courts.

The *Gamble* holding has been much criticized, both by commentators[12] and courts.[13] The Third Circuit itself has repu-

---

**9.** The district court did not attempt to base its actions on any of the Congressional statutes or Federal Rules that explicitly provide for sanctioning attorneys or litigants. *See, e.g.,* Fed.R. Civ.Pro. 11 (sanction for frivolous litigation); 28 U.S.C. § 1927 (penalties for vexatious litigation).

**10.** Rule 2.2.3.1 permits appearances, at the discretion of the trial judge, on a *pro hac vice* basis. At trial, Mr. Orr suggested as an alternative to mistrial, that he be permitted to appear on the basis of comity. However, Rule 2.2.3.2 bars residents of California from practicing *pro hac vice* in the Central District. We express no view on the force or reasonableness of this rule. *Compare* Local Rule 110–2(b) of the Northern District of California (permitting *any* attorney admitted before any United States Court or before the highest court of any state or territory to appear *pro hac vice.*)

**11.** *See Link v. Wabash R.R. Co.*, 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962).

**12.** *See, e.g.,* Renfrew, *Discovery Sanctions: A Judicial Perspective*, 67 Cal.L.Rev. 264, 270 (1979); Comment, *Financial Penalties Imposed Directly Against Attorneys in Litigation Without Resort to the Contempt Power*, 26 U.C.L.A. 855, 876–78 (1979); Comment, *Sanctions Imposed by Courts on Attorneys Who Abuse the Judicial Process*, 44 U.Chi.L.Rev. 619 (1977); Note, *Dismissal for Failure to Attend a Pretrial Conference and the Use of Sanctions at Preperatory Stages of Litigation*, 72 Yale L.J. 819, 830 (1963).

**13.** *See, e.g., Adduono v. World Hockey Ass'n*, 824 F.2d 617, 622 (8th Cir.1987); *Donaldson v. Clark*, 819 F.2d 1551, 1557 n. 6 (11th Cir.1987); *In re Howe*, 800 F.2d 1251, 1252 (4th Cir.1986); *Martinez v. Thrifty Drug & Discount Co.*, 593 F.2d 992, 993 (10th Cir.1979); *In re Sutter*, 543 F.2d 1030, 1035 (2d Cir.1976); *Richman v. General Motors Corp.*, 437 F.2d 196, 200 (1st Cir. 1971).

diated *Gamble. See Eash v. Riggins Trucking Co.*, 757 F.2d 557 (3d Cir.1985) (en banc). In our seminal decision on the issue, *Miranda v. Southern Pacific Transportation Co.*, 710 F.2d 516 (9th Cir.1983), we declined to follow *Gamble* and adopted the theories advocated by Chief Judge Biggs.[14] "We see no reason to preclude the use of reasonable monetary sanctions against attorneys for violations of local rules when they are the offending parties." *Id.* at 521.

The *Miranda* court concluded that the power to issue sanctions under local rules has two sources. First, the authority to sanction attorneys under local rules emanates from the trial court's inherent power. *Miranda*, 710 F.2d at 520. *See also Roadway Express Inc. v. Piper*, 447 U.S. 752, 766, 100 S.Ct. 2455, 24, 65 L.Ed.2d 488 (1980) (recognizing the "well-acknowledged" inherent power of the court to levy sanctions). This inherent authority flows from the very nature of a court, from strict functional necessity. *Michaelson v. United States*, 266 U.S. 42, 66, 45 S.Ct. 18, 20, 69 L.Ed. 162 (1924). *See also Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 450–51, 31 S.Ct. 492, 501–02, 55 L.Ed. 797 ("[w]ithout authority to act promptly and independently the courts could not administer public justice or enforce the rights of public litigants"). Second, Congress has expressly granted to the various district courts the authority to promulgate rules governing its practice. *See* Fed.R.Civ.Pro. 83. In *Miranda*, we suggested that pursuant to this authority the district courts could penalize attorneys for violations of local rules. 710 F.2d at 520. There are, however, limitations on both roots of power. We now turn to the question of what limitations apply.

### 1. *Inherent Power*

■ Inherent powers derive from the absolute need of a trial judge to maintain order and preserve the dignity of the court. *See Cooke v. United States*, 267 U.S. 517, 539, 45 S.Ct. 390, 395, 69 L.Ed. 767 (1925). Although it is now unchallenged in this circuit that a district court has inherent authority to sanction miscreant attorneys, there are factual and legal prerequisites to the exercise of this power. Because "inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion." *Roadway Express*, 447 U.S. at 764, 100 S.Ct. at 2463. To insure that restraint is properly exercised, we have routinely insisted upon a finding of bad faith before sanctions may be imposed under the court's inherent power. *Id.* at 765–66, 100 S.Ct. at 2463–64.[15] *See also McCabe*, 827 F.2d at 640 ("court would have to make a finding of bad faith"); *United States v. Stoneberger*, 805 F.2d 1391, 1393 (9th Cir.1986); *In re Itel Securities Litigation*, 791 F.2d 672, 675 (9th Cir.1986), *cert. denied sub nom Bader v. Itel Corp.*, 479 U.S. 1033, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987) (quoting *Toombs*, 777 F.2d at 471). A specific finding of bad faith by the trial judge or magistrate must accompany the sanction order in all such cases. *Stoneberger*, 805 F.2d at 1393.

### 2. *Statutory Authority*

Our holding in *Miranda* has been routinely cited for the proposition that the power of the trial court to impose sanctions is limited by the court's inherent power and, by implication, by the requirement of bad faith conduct on the part of the sanctioned parties. *See, e.g., Ray A. Scharer and Co., Inc. v. Plabell Rubber Products, Inc.*, 858 F.2d 317, 321 (6th Cir.1988); *Braley v. Campbell*, 832 F.2d 1504, 1510 n. 5 (10th Cir.1987) (en banc); *McCabe*, 827 F.2d

---

**14.** *Miranda* spawned three separate opinions by the members of the panel. Although all three judges expressed differing views on the subject of sanctions, Judges Wallace and Alarcon joined separate sections of Judge Hug's lead opinion so that each section had a majority, albeit a different one. *Miranda*, 710 F.2d at 523 n. 14. Consequently, the case is binding precedent in this circuit.

**15.** The Supreme Court's decision in *Roadway Express* dealt specifically with the payment of attorneys' fees to opposing counsel. The logic of the opinion would, however, also extend to costs and fines levied under the court's inherent authority.

at 640; *Adduono*, 824 F.2d at 621; *In re Howe*, 800 F.2d at 1252; *Toombs*, 777 F.2d at 471; *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1209 (11th Cir. 1985). However, a close reading of *Miranda* makes it clear that the district court's power to impose sanctions stems from a broader base than its inherent authority.

█ The authority of a district court to sanction attorneys derives not just from an inherent *judicial* power but from the *legislative* grant of authority to promulgate rules. In Rule 83 of the Federal Rules of Civil Procedure and in 28 U.S.C. § 2071,[16] Congress provided authority to the federal courts to make local rules for the proper administration of judicial business. Section 2071 provides that the "Supreme Court and all courts established by Act of Congress may from time to time prescribe rules for the conduct of their business."[17] Under this provision, the federal courts may establish rules for the orderly processing of its docket "provided that such rules are not repugnant to the laws of the United States." *Heckers v. Fowler*, 69 U.S. (2 Wall.) 123, 128, 17 L.Ed. 759 (1864).

The extent of the legislative delegation is an issue of some debate. Substantive local rules have been challenged on the theory that the enabling statute was intended only for the narrow administrative purpose of permitting the federal courts to issue rules covering "noncontroversial housekeeping matters." 12 C. Wright & A. Miller, *Federal Practice and Procedure* § 3152, at 228 (1973).[18] Consequently, some local rules have been criticized—indeed struck down—for reaching beyond the legislative grant of power and instituting "basic procedural innovations". *See Miner v. Atlass*, 363 U.S. 641, 80 S.Ct. 1300, 4 L.Ed.2d 1462 (1960).[19] More recently, the Supreme Court has interpreted the "basic procedural innovation" bar of *Miner* to limit only "those aspects of the litigatory process which bear upon the ultimate outcome of the litigation ..." *Colgrove v. Battin*, 413 U.S. 149, 163 n. 23, 93 S.Ct. 2448, 2456 n. 23, 37 L.Ed.2d 522 (1973).[20] Although sanctions may have a substantive effect on the rights and duties of litigants and lawyers, they do not fall within the parameters of the outcome-determinative test of *Colgrove*. *See Eash*, 757 F.2d at 569.

Congress, in passing section 2071, did not intend to permit the federal courts to arrogate unto themselves substantial powers over either litigants or members of the bar. Nevertheless, while we carefully scrutinize claims of judicial overreaching, we have held that Congress did authorize the federal courts to impose a "relatively mild" form of sanctions as a means of preserving authority and control over the district bar. *See Miranda*, 710 F.2d at 519. We think this authority is implicit in the right to make rules for the orderly administration of justice. Without a narrow sanctions power, district courts might have difficulty preserving the vitality of local rules

16. At least one court has viewed § 2071 and Rule 83 as a simple codification of the federal court's inherent powers. *White v. Raymark Industries, Inc.*, 783 F.2d 1175, 1178 (4th Cir.1986). Under this theory, the district court's power under the Rules Enabling Act is coextensive with the judiciary's inherent authority. Most courts, however, have viewed section 2071 as an independent attempt by Congress to provide a separate rulemaking privilege.

17. Rule 83 in relevant part provides that "[e]ach district court by action of a majority of the judges thereof may from time to time ... make and amend rules governing its practice not inconsistent with these rules." In form and function, Rule 83 follows Section 2071. *See* Advisory Committee Note to Fed.R.Civ.Pro.R. 83.

18. *Compare* Note, *Rule 83 and the Local Federal Rules*, 67 Colum.L.Rev. 1251 (1967) (narrow construction of Rules Enabling Act) with Flanders, *Local Rules in Federal District Courts: Usurption, Legislation, or Information?*, 14 Loyola (Los Angeles) L.Rev. 213 (1981) (broad interpretation of grant of power).

19. *Miner* struck down a rule authorizing discovery-deposition practice in admirality cases.

20. *Colgrove* upheld a local rule requiring a six-member jury in civil actions. The Court held that the reduction from 12 to 6 member juries does not bear on the ultimate outcome of the case because it has been demonstrated that there is "no discernible difference between the results reached by the two different-sized juries." 413 U.S. at 163 n. 23, 93 S.Ct. at 2456 n. 23 (quoting *Williams v. Florida*, 399 U.S. 78, 101, 90 S.Ct. 1893, 1906, 26 L.Ed.2d 446 (1970)).

against repeated disobedience short of wielding its greater, less surgical, the powers over parties. *Id.* at 522.

■ However, the legislative grant of power is not a discretionless or roving commission for the district court to bludgeon violators of local or federal rules. Several factors limit the district court in this regard. First, by the terms of the statute, sanctions must be consistent with the Federal Rules and with other statutes. *See Martinez,* 593 F.2d at 993 ("the rule ... [must] ... be consistent with the Acts of Congress and the rules prescribed by the Supreme Court"). Second, the order must be necessary for the court to "carry out the conduct of its business." *Frazier v. Heebe,* 482 U.S. 641, 107 S.Ct. 2607, 2611, 96 L.Ed.2d 557 (1987). There must be a close connection between the sanctionable conduct and the need to preserve the integrity of the court docket or the sanctity of the federal rules. Third, the order must be consistent with "principles of right and justice." *Id.* (quoting *In re Ruffalo,* 390 U.S. 544, 554, 88 S.Ct. 1222, 1228, 20 L.Ed.2d 117 (1968) (White, J., concurring). Finally, any sanction imposed must be proportionate to the offense and commensurate with principles of restraint and dignity inherent in judicial power.[21] This last principle includes a responsibility to consider the usefulness of more moderate penalties before imposing a monetary sanction.

In determining the reach of the sanction authority, our courts are guided by the mandate of Federal Rule 1. The rules "shall be construed to secure the just, speedy and inexpensive determination of every action." Judge Wisdom's eloquent message to the district courts, powerful 25 years ago, still stands as a forceful reminder of the fairness limits of the sanctions power. "The force of this first and great-est of the Rules should not be blunted by district court's exaggerating the importance of local rules and enforcing such rules through inappropriate over-rigorous sanctions." *Woodham v. American Cystoscope Co.,* 335 F.2d 551, 557 (5th Cir. 1964). *See also Loya v. Desert Sands Unified School District,* 721 F.2d 279, 281 (9th Cir.1983).

■ Thus, while we believe that Congress authorized the federal courts to wield reasonable authority over attorneys appearing before them, we do not think that the imposition of financial sanctions for mere negligent violations of the local rules is consistent with the intent of Congress or with the restraint required of the federal courts in sanction cases. "Attorneys should not be 'disciplined by financial reprisal for conduct attributable to mistake, inadvertence or error of judgment.'" *In re Sutter,* 543 F.2d at 1035. Thus, courts have required conduct amounting to reck-lessness,[22] gross negligence, repeated—although unintentional—flouting of court rules,[23] or willful misconduct before approving the imposition of monetary sanctions under local rules. A practice that punishes mere negligence on the part of counsel is not necessary to the orderly functioning of the court system, especially in light of the availability of alternative remedies.[24] *See* 18 U.S.C. § 401 (the federal contempt statute).

■ Moreover, we think it inappropriate for the court system to claim "compensation" for being "ill-used". The court system is not a private party that needs to be reimbursed for its inconvenience. Consequently, absent grossly negligent, reckless, or willful conduct, monetary penalties such as jury costs or judicial sanctions cannot be fairly levied against counsel for a violation of the local rules.

---

**21.** While we think that a serious question is raised under this prong of the rule with respect both to the dismissal, *see supra* n. 4, and the amount of the sanctions, in view of our disposition, *infra* p. 1484, we do not rest our decision on that ground.

**22.** *In re Sutter,* 543 F.2d at 1035.

**23.** *See Miranda,* 710 F.2d at 519 (violation of local rule after court warned attorneys of possible sanction).

**24.** As anyone experienced in litigation knows, lectures in open court are often sufficient to press home the significance of local rules, particularly for a first offense. Public embarrassment is, beyond cavil, a powerful motivator of human conduct.

## B. *Sanctions in the Form of Attorneys' Fees*

▮ Appellees also argue that the district court was justified in awarding attorneys' fees to them. Local Rule 27.1 permits sanctions in the form of attorneys' fees as well as fines payable to the Court. However, a careful analysis of the bases for current decisional law dictates the admittedly incongruous result that, when the sanctions are imposed pursuant to a local rule, there is an even higher threshold for awarding attorneys fees than for leveling direct fines against members of the bar. Consequently, we hold that Local Rule 27.1 is valid but only in so much as it permits taxing fees for bad faith actions or willful disobedience of court orders or rules.

The Supreme Court has set down specific guidelines for awarding attorneys' fees. In *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), the Supreme Court affirmed the "American Rule" that absent express statutory authority, bad faith or willful disobedience of a court order, each party should bear the cost of its own attorneys' fees. Congress has not "extended any roving authority to the Judiciary to allow counsel fees as costs or otherwise whenever the courts might deem them warranted." *Id.* at 260, 95 S.Ct. at 1623. Under the Supreme Court's interpretation of the 1853 Fees Act and subsequent statutes, it is clear that "Congress meant to impose rigid controls on cost-shifting in federal courts." *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 444, 107 S.Ct. 2494, 2498, 96 L.Ed.2d 385 (1987). The general rule derived from *Alyeska Pipeline* and its progeny is that the federal courts cannot, absent specific statutory authority or one of the three enumerated

exceptions listed by the Supreme Court,[25] alter the uniform system of cost-bearing created by Congress, *Tiedel v. Northwestern Michigan College*, 865 F.2d 88, 93–94 (6th Cir.1988), or shift attorneys' fees merely because a party has lost a case or offended some legal norm. "Where Congress has deemed it permissible for federal courts to award actual attorneys' fees, it has said so ... Absent such explicit authorization, federal courts may exercise their inherent powers to tax attorneys' fees only in the narrowly defined circumstances." *Id.* at 93 (citing *Roadway Express*, 447 U.S. at 765, 100 S.Ct. at 2463; *Ray A. Scharer & Co. v. Plabell Rubber Prod., Inc.*, 858 F.2d 317, 320 (6th Cir.1988)).

Here, the district court's authority to impose sanctions under Local Rule 27.1 is premised not on a "specific and explicit" statutory right to impose fees but on a general delegation of rulemaking authority. Such a claim of delegation does not fulfill the specific congressional authorization requirements laid out in *Alyeska Pipeline* or overcome the general presumption against awarding attorneys' fees. *Alyeska Pipeline*, 421 U.S. at 269, 95 S.Ct. at 1627. If we were to uphold the award of attorneys' fees on the basis of so tenuous an authorization, we would be reinstating the roving commission explicitly banned in *Alyeska Pipeline*.[26]

▮ We recognize that the Central District is perfectly entitled to promulgate a rule permitting the taxation of attorneys' fees. Although Congress has never expressly delegated any *general* authority (*compare* Rule 11) to the courts to impose sanctions in the form of fee awards, dis-

---

**25.** The Supreme Court enumerated three accepted exceptions to the American Rule: bad faith or abusive litigation, willful disobedience of a court order, and common fund cases, which permit fee shifting in class, trust and shareholder derivative actions.

**26.** Federal Rule of Civil Procedure 11 expressly provides for attorneys' fees awards. The Federal Rules of Civil Procedure, unlike the local rules, are presented to Congress and carry its imprimatur. *See Hanna v. Plumer*, 380 U.S. 460, 471, 85 S.Ct. 1136, 1143, 14 L.Ed.2d 8 (1965). The Rules Enabling Act, which permits

the Supreme Court to prescribe general rules for the district courts, expressly requires presentment to Congress. "Such united rules shall not take effect until they shall have been reported to Congress by the Attorney General at the beginning of a regular session thereof and until after the close of such a session." 28 U.S.C. § 2072. Thus, Congress is given the opportunity to take action to disapprove the rules; the failure to act constitutes implicit approval. Accordingly, our delegation analysis is inapplicable to Rule 11 or any of the other rules required to be submitted to Congress.

trict courts still possess the inherent power[27] to do so in the case of bad faith litigation or willful disobedience of court rules or orders. We hold simply that in the absence of an explicit Congressional authorization,[28] the factual prerequisites of bad faith misconduct or willful disobedience laid out in *Alyeska* must be met.

\* \* \* \* \* \*

We have concluded that the district court may, if there is gross negligence or reckless conduct on an attorney's part, impose a reasonable fine against him. Moreover, if a case is prosecuted in bad faith or in deliberate violation of a court order, the trial court may be justified in sanctioning the attorney by fining him or ordering him to compensate the prevailing party for attorneys' fees. We now turn to the particular circumstances of this case.

### C. *The Alleged Violations*

### 1. *Control of the District Bar*

Every state has the authority to regulate admission to its bar. Under our federal system, local substantive and procedural rules differ from jurisdiction to jurisdiction and the intimate knowledge that a lawyer has of the laws of one state may have scant application in the courts of another. Even neighboring states have laws which have no common bond; any person trying to harmonize Texas and Louisiana law faces a daunting task. Consequently, any state may license and regulate the entrance of lawyers to practice within its territory. *See Leis v. Flynt*, 439 U.S. 438, 442, 99 S.Ct. 698, 700, 58 L.Ed.2d 717 (1979) (per curiam). States also have an interest in insuring that the members of their bar possess good moral character and have an acceptable understanding of local law. *See Supreme Court of New Hampshire v. Piper*, 470 U.S. 274, 285, 105 S.Ct. 1272, 1279, 84 L.Ed.2d 205 (1985). Thus, to protect consumers from dishonest or inadequate representation, state bars may act as watchdogs over entrance into the legal profession.[29]

■ While the states shape the general requirements for admission into the legal profession, federal courts too possess an interest in maintaining standards of admission. *Frazier v. Heebe*, 482 U.S. 641, 107 S.Ct. 2607, 2611, 96 L.Ed.2d 557 (1987). Authority over the bar harkens back to the days of English common law and is now codified in federal statutes. "In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively are permitted to manage and conduct causes therein." 28 U.S.C. § 1654. *See generally* Friedman, *The History of*

---

**27.** The bad faith exception to the American rule in fact comes directly from the court's inherent authority to sanction willful violations of its rules. *Alyeska Pipeline*, 421 U.S. at 258–59, 95 S.Ct. at 1622–23. *See also Toledo Scale Co. v. Computing Scale Co.*, 261 U.S. 399, 426–28, 43 S.Ct. 458, 465–66, 67 L.Ed. 719 (1923). We recognize that, at first glance, the different standards for leveling fines and shifting fees may be somewhat jarring. However, we see at least two potential reasons for this asymmetry. The first reason may be simply historical. "The general practice of the United States is in oposition [sic]" to fee shifting absent explicit statutory authority. *Alyeska*, 421 U.S. at 249, 95 S.Ct. at 1617 (quoting *Arcambel v. Wiseman*, 3 U.S. (3 Dall.) 306, 4 L.Ed. 613 (1796). Conversely, federal courts have long been able to impose reasonable fines for misconduct of members of the bar. *Eash*, 757 F.2d at 566. There is thus good historical reason to require a more explicit Congressional delegation in the fees context. Moreover, this rule may reflect Congress' determination that a court may issue a proportionate fine to maintain order and that the size of the oppos-

ing side's fees often have little to do with the gravity of the offense. We recognize that, although the noncompensatory nature of our legal system has been frequently criticized, the decision of when courts may shift fees generally lies with Congress.

**28.** When Congress has authorized the courts to award attorneys' fees, it has done so explicitly. *See, e.g.,* 15 U.S.C. § 15a (the federal antitrust statute); 35 U.S.C. § 285 (authorizing fee shifting in certain patent cases).

**29.** States, of course, generally enforce the knowledge requirement through the painful ritual known as the bar exam. "A bar examination, as we know judicially and from our own experience, is not a casual or lighthearted affair." *Supreme Court of Virginia v. Friedman*, 487 U.S. 59, 108 S.Ct. 2260, 2266, 101 L.Ed.2d 56 (1988). Fortunately, for both fledgling and experienced lawyers, no equivalent exists for admission to the federal bars, since we deem one such experience to constitute sufficient punishment.

*American Law* 276–77 (1963). Admission into a state bar does not, at least in theory, carry with it an automatic entitlement for admission into the federal district courts of that state. *Raiford v. Pounds*, 640 F.2d 944, 946 (9th Cir.1981). Nor, in theory, does admission into one federal bar guarantee the right to appear before other federal courts. Federal courts may set reasonable standards for admission, independent of the requirements established by coequal courts. *Greer's Refuse Services, Inc. v. Browning–Ferris Industries*, 782 F.2d 918, 923 (11th Cir.1986), *cert. denied sub nom Wilkes v. District Court*, — U.S. —, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988).

At the same time, we would be guilty of serious self-delusion if we did not acknowledge that, as a practical matter, the application process for admission before the federal district courts is generally perfunctory and pro forma. Admission to the state bar is the essential determinant of professional ethics and legal competence. *In re Evans*, 524 F.2d 1004, 1007 (5th Cir.1975). The substantive knowledge required to practice in federal court is generally the same throughout the country. Since 1938, the federal courts have been engaged in the task of applying a uniform body of procedure and evidence; federal statutes are applicable in all jurisdictions. As a consequence, attorneys throughout the country are aware of the nature and extent of the relevant law, and there is little reason for a district court to test substantive knowledge on the part of lawyers admitted in other jurisdictions. Similarly, ethical doubts are best resolved through state bar proceedings. "Admission to a state bar creates a presumption of good moral character that cannot be overcome at the whims of the District Court." *Id.* *But see Greer's Refuse Services*, 782 F.2d at 923. From a practical perspective, there exists little reason for a member of any state bar to fear

the admissions process of the Central District; entrance into federal court for the average member of the state bar is little more than a mechanical nuisance.[30] *See* Letter from Judge Gadbois to Chief Judge Real ("at the least we should assure [sic] that these guys don't ever get admitted here, at least on the usual mechanical basis"). The basic determinants of legal and moral competence lie with the state, not the federal, bar. Although it is not our purpose to denigrate the standards of the Central District Bar, we highlight their limitations to illustrate the fact that attorneys have little or no reason to avoid consciously the admittance procedure established under the local rules.

### 2. *Appellants' Failure to Join the District Bar*

■ Against this legal and factual backdrop, we must evaluate the sanctions imposed against Tafolla and Orr. Nothing in the record indicates that their failure to request admission to the district bar was anything more than an oversight or ordinary negligence on their part. Tafolla, at the time of the trial, had been admitted to the California Bar and to the Bar of the Southern District of California for over 12 years. As the numerous affidavits presented on appeal attest, Tafolla had little to fear from the minimal qualifications and character test imposed under Rule 2.2. Similarly, Orr had been an active member of the same two bars for over five years. No evidence suggests that he had any cause to avoid the requirements of the local rules. Pointedly, appellees did not claim at oral argument that the facts warranted a finding of intentional misconduct on the part of appellants. Nor have they offered any reason why Tafolla and Orr would not have been admitted had they taken the five

---

**30.** Under Central District rules, there are only three enumerated requirements for admission to the bar. *See* Local Rule 2.2. An applicant must be a member of the California bar, be of good moral character, and have a member of the Central District bar move for his admission. The second requirement is normally fulfilled when the attorney moving the applicant's admission reads a pro forma statement to the effect

that he knows the applicant to be a person of good moral character. We note that good moral character is, in any event, a prerequisite for membership in the California bar. We also note, without comment, that the legality of the California bar membership prerequisite is presently being challenged in this court. *See Giannini v. Real*, 711 F.Supp. 992 (C.D.Cal.1989).

or ten minutes necessary to fill out the application form and take the oath.

In this situation, it is easy to credit appellants' factual representations. Tafolla, the original counsel of record in this case, contends that, while recognizing that he would have had to become a member of the Bar for the purposes of trial, he believed that admission before the Central District was not a necessary prerequisite to the signing of pleadings. He further contends that he intended to apply for admission into the local bar prior to trial but that, several months before the scheduled trial date, a riding accident resulted in a life-threatening injury, and he turned the trial over to Orr.

Similarly, there is nothing in the record to support a finding that Orr willfully violated the rules. His offense, like Tafolla's, appears to be a result of inadvertence or neglect. The record before us suggests that Judge Gadbois permitted Orr to handle certain pretrial matters without first requiring that he be admitted to the District bar and that Orr thought that, in doing so, the Court had approved his appearance for all purposes. Although counsel's misunderstanding may reflect a lack of diligent attention to the local rules, nothing in the record suggests any bad faith, or even gross negligence, on his part.

We conclude that appellants did not act in bad faith or engage in willful misconduct when they failed to apply for admission to the Central District bar. Consequently, the award of attorneys' fees [31] to the defendants was improper. Similarly, financial sanctions payable to the court could not be imposed under the court's inherent power. We also conclude that the record does not support a finding of gross negligence or reckless conduct on the part of Tafolla and Orr. Therefore, the financial sanctions payable to the court could not be properly imposed under the statutory authority granted by Congress. Accordingly, we vacate the sanctions and fees award.[32]

## IV. *Conclusion*

We do not suggest that under other circumstances lawyers who fail to apply for membership in the district court bar will be immune from sanctions. Willful or reckless disregard of court rules justifies punitive action; such conduct contributes to the glacial pace of litigation; when lawyers and litigants ignore the procedures established by the court, they invite delay and conflict into the courtroom.

Nevertheless, we cannot be blind to the situations where trial courts overreact to perceived or minor slights. Here, there is no indication in the record that counsel were guilty of anything more than simple negligence. Furthermore, we are well aware that all parties to the litigation were disadvantaged by the court's ruling. Both parties were forced to start over in a case that had been in preparation for years; the

---

**31.** The fees in this case include approximately $800 in witness costs. Local Rule 16.2.2 permits the defendant to recover specified costs when the court orders dismissal or enters judgment in favor of the defendant. Here, however, the district court did not award costs on the theory that defendants were prevailing parties under Rule 16.2.2. It awarded costs, like attorneys' fees, as part of its sanctions order. *See, supra* p. 1481. We see no reason for distinguishing between costs and other sanctions in such circumstance and, therefore, vacate the award of costs along with the rest of the order.

**32.** In this case, remand is not necessary because a sufficient understanding of the issues may be gleaned from the record without the aid of separate findings. *See Optyl Eyewear Fashion Int'l Corp. v. Style Companies, Ltd.,* 760 F.2d 1045, 1051 (9th Cir.1985) (citing *Swanson v. Levy,* 509 F.2d 859, 861 (9th Cir.1975)). We would, as a general rule, prefer factual findings from the district court. However, we do not rest our conclusions here on any factual matters not presented to that court and not adequately preserved in the record. Where, as here, the record below provides ample support for our conclusions and the parties have already expended substantial time and money on appeal over satellite litigation involving a minor violation of the local rules, we think that the cause of the orderly administration of justice is best served by simply vacating the order rather than by also remanding the case to the district court for further proceedings. In reaching this conclusion, we are mindful of the fact that in sanctions cases, as in contempt cases, an appellate court has a special responsibility to insure that judicial power is not abused, including the duty to review and, when appropriate, revise the penalties handed down by the trial court. *See United States v. Flynt,* 756 F.2d 1352, 1366–67 (9th Cir.1985).

attorneys were forced to pursue an expensive and embarrassing appeal. Even the trial docket would have been spared needless burdens if the Court had avoided drastic remedies. In vacating the financial sanctions here, we do not condone the carelessness of appellants. Nor do we intend to limit the district courts unduly; lawyers who willfully, repeatedly, or recklessly disregard court rules or orders may be sanctioned. But the authority of the court to punish violations of local rules should be reserved for serious breaches. Because counsel's conduct was only inadvertent, this is not such a case.

VACATED.