**Linda GUERRA and Fermin Trabanino, a married couple, Plaintiffs,**

v.

**UNITED STATES of America, et al., Defendants.**

**No. 09–CV–01027–RSM.**

United States District Court, W.D. Washington, at Seattle.

Signed Oct. 21, 2014.

Robert H. Gibbs, Neha Vyas, Gibbs Houston Pauw, Seattle, WA, for Plaintiffs.

Aaron S. Goldsmith, Washington, DC, Kayla Stahman, U.S. Attorney's Office, Seattle, WA, for Defendants.

## ORDER ON MOTION FOR ATTORNEYS' FEES

RICARDO S. MARTINEZ, District Judge.

THIS MATTER comes before the Court upon Motion for Attorneys' Fees by Plaintiffs Linda Guerra and Fermin Trabanino. Dkt. # 104. The Court heard oral argument on Plaintiffs' Motion, pursuant to which it deferred resolution of this matter pending ultimately unsuccessful settlement negotiations between the parties. *See* Dkts # 126, 127, 129. Having considered the parties' briefs and supporting declarations, positions advanced during oral argument, the remainder of the record, and applicable case law, the Court grants Plaintiff's Motion in part for the reasons stated herein.

## BACKGROUND

Plaintiff Ms. Linda Guerra is a citizen of Honduras, residing in Snohomish, WA. She first arrived in the United States in 1989 as a nonimmigrant exchange visitor under 8 U.S.C. § 1101(a)(15)(J) (a "J visa"), funded by USAID as an exchange visitor to pursue further education and training. Dkt. # 50 (Second Amended Complaint, hereinafter "SAC"), ¶ 14. Ms. Guerra's J–1 visa was subject to a two year foreign residency requirement ("FRR"), under 8 U.S.C. § 1182(e) obligating her to return to Honduras for two years following her training in the U.S., absent the approval of a waiver of this requirement. *Id.* at ¶ 15.

Ms. Guerra initiated the process toward attaining legal permanent residency when

she applied for asylum with the United States Citizenship and Immigration Services ("USCIS") in 1994. In 2006, while that application was pending, Ms. Guerra married Plaintiff Fermin Trabanino. SAC, ¶ 20. Mr. Trabanino, now a U.S. citizen, was granted legal permanent resident ("LPR") status on November 8, 2006 through the Nicaraguan Adjustment and Central American Relief Act ("NACARA"). NACARA provides derivative benefits to spouses. IIRAIRA § 309(c)(5)(C)(i)(III), *amended by* NACARA § 203(a)(1); 8 C.F.R. § 240.61(a)(4). Ms. Guerra submitted an I–881 application pursuant to NACARA on June 13, 2007, as Mr. Trabanino's spouse. SAC, ¶ 34.

While the NACARA application was pending, Ms. Guerra filed an I–612 application ("waiver application") (EAC0822840553) with USCIS. *Id.* at ¶ 36. She also filed form DS 3035 (838186) with the Department of State ("DOS") to waive the two-year foreign residency requirements of her J–1 visa. *Id.* This application was based on a "no objection" waiver from her home country. Despite receiving a no objection letter from the government of Honduras in 2007, the Department of State denied Ms. Guerra's waiver application on May 14, 2008. *Id.*

Ms. Guerra filed a second I–612 waiver application with USCIS (WAC–08–231–50628) and DOS (838186) on August 25, 2008, this time based on "exceptional hardship" to Mr. Trabanino. *Id.* at ¶ 37. USCIS erroneously transferred that application to the San Francisco Asylum Office on September 9, 2008. *Id.* Ms. Guerra, through her counsel, made fourteen separate inquiries to USCIS following the incorrect transfer of her I–612 application seeking to enable its adjudication. Despite these inquiries, USCIS did not take any action to transfer Ms. Guerra's file to the correct office. Instead, USCIS directed Ms. Guerra to contact the S.F. Asylum Office. The S.F. Asylum Office, in turn, informed Ms. Guerra's counsel on June 22, 2009 that the file could not be transferred for decision absent a request from the USCIS service center. *Id.* at ¶ 40. Also in June 2009, the S.F. Asylum Office dismissed Ms. Guerra's NACARA and asylum applications based on her failure to appear for her NACARA interview, despite the Office's own failure to inform Ms. Guerra that her request to postpone the interview had been denied. *Id.* at ¶¶ 42, 43. The Asylum Office consequently issued Ms. Guerra a Notice to Appear for Removal Proceedings ("NTA") and set a hearing date. *Id.* at ¶ 43.

Plaintiffs initiated the instant action by filing their initial Complaint on July 20, 2009, in order to compel Defendants to adjudicate Ms. Guerra's J–1 waiver application so that her NACARA derivative application could then be approved by USCIS. *See* Dkt. # 1 (Complaint). A month later, Ms. Guerra appeared before an immigration judge in Seattle, as required by the NTA served by the S.F. Asylum Office, and was informed by the court clerk that the NTA had never actually been filed with the court and no hearing date had been scheduled. SAC, ¶ 45. On September 14, 2009, the deadline for Defendants to respond to Plaintiffs' then pending summary judgment motion in this action, Defendant USCIS rendered a decision on Ms. Guerra's waiver application. The decision erroneously described Ms. Guerra as a Chinese national who had entered the U.S. in 2006 on a J–1 visa and wrongly asserted that she had failed to provide evidence of her spouse's medical condition. *See* Dkt. # 12, Ex. A. Ms. Guerra had, in fact, filed supplemental medical evidence of her husband's worsening medical condition on August 20, 2009. *See* Dkt. # 6.

After Ms. Guerra's counsel notified US-CIS of the mistake, USCIS reissued the decision on September 17, 2009 to reflect that Ms. Guerra was, in fact, a citizen of Honduras. SAC, ¶ 81. USCIS admits that its initial denial was erroneous. Dkt. # 112, p. 6. USCIS subsequently reopened its erroneous denial, reconsidered it, and reversed it, finding that Mr. Trabanino would suffer exceptional hardship if Ms. Guerra returned to Honduras to satisfy her two-year residency requirement. Dkt. # 112, p. 6; SAC, ¶¶ 83, 86. On October 15, 2009, USCIS forwarded its finding to the Department of State. *Id.* at ¶ 86.

In November 2009, the DOS decided that the hardship to Mr. Trabanino was outweighed by program and policy concerns. SAC, ¶ 87. Based on this determination, USCIS denied Ms. Guerra's hardship waiver on November 13, 2009. *Id.* at ¶ 88. Plaintiffs filed their first amended complaint on February 4, 2010 challenging this denial. *See* Dkt. # 28 (First Amended Complaint). Plaintiffs subsequently moved the Court to compel Defendants to supplement Ms. Guerra's Administrative Record ("AR"), which they argued was missing documents relating to the State Department's evaluation of Ms. Guerra's waiver application. *See* Dkt. # 35.

On March 22, 2010, Defendants filed a motion to dismiss arguing that, as a matter of law, this Court lacked jurisdiction to review the State Department's determination and that Plaintiffs had failed to state a due process claim because they could not show a due process interest in a discretionary waiver. Dkt. # 36, pp. 5–8. Although Defendants' motion to dismiss did not rely on any factual assertions, Defendants submitted declarations from the State Department and USCIS that explained the adjudication process and provided background information. *See* Dkt. # 35, Ex. A, C. On July 20, 2010, this Court granted in part and denied in part Defendants' motion,

providing Plaintiffs leave to file a second amended complaint. *See* Dkt. # 49; SAC. In December 2010, the Court granted Plaintiffs' motion to supplement the record and denied Defendants' motion to reconsider its decision. *See* Dkt. # 61, 66, 67. The Department of State filed Ms. Guerra's supplemented Administrative Record under seal in January 2011. *See* Dkt. # 68.

On January 20, 2011, USCIS issued its final decision denying the hardship waiver again based on the State Department's recommendation. Shortly thereafter, USCIS agreed to allow Ms. Guerra to reopen her previously denied asylum claim rather than pursuing the remaining J–1 waiver NACARA issues, and the parties agreed to stay the case pending USCIS's determination. *See* Dkt. # 74. Ms. Guerra was ultimately granted asylum and filed an application for adjustment of status on this basis, which does not require a waiver of the foreign residency requirement. *See* 8 C.F.R. § 1209.2(b). As a result, the parties never litigated the claims in Plaintiffs' Second Amended Complaint, and the Court never determined whether the final January 20, 2011 denial was proper.

Through the instant Motion, Plaintiffs Linda Guerra and her husband, Fermin Trabanino, seek an award of bad faith attorneys' fees based on the conduct of USCIS and DOS in adjudicating Ms. Guerra's hardship waiver application, as well as during the instant litigation. Plaintiffs claim that Defendants' conduct unreasonably induced and then multiplied these proceedings, resulting in four years of unnecessary litigation, substantial attorneys' fees, and worsening of Mr. Trabanino's medical condition. Dkt. # 104, p. 1. Plaintiffs also contend that Defendants' conduct in this case went beyond mere ministerial errors often associated with large government agencies, including presenting false

and misleading information to the Court through sworn affidavits. *Id.* at pp. 1–2. As USCIS has granted Ms. Guerra LPR status (*see* Dkt. # 112, Ex. 1)—the ultimate relief sought in this action—whether to award bad faith attorneys' fees is the only issue remaining in this litigation.

## ANALYSIS

### a) Legal Standard

"Although the traditional American rule ordinarily disfavors the allowance of attorneys' fees in the absence of statutory or contractual authorization, federal courts, in the exercise of their equitable powers, may award attorneys' fees when the interests of justice so require." *Hall v. Cole,* 412 U.S. 1, 4–5, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973). The bad faith exception to the American Rule allows the court, though its inherent powers, to assess attorney's fees when a party has "acted in bad faith, vexatiously, or for oppressive reasons." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45–46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (quoting *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)). An award of bad faith fees is not limited to the prevailing parties, depending instead on "how the parties conduct themselves during the litigation." *Id.* at 53, 111 S.Ct. 2123. The imposition of sanctions thereby serves the dual purpose of "vindicating judicial authority" and "making the prevailing party whole for expenses caused by his opponent's obstinacy." *Id.* at 46, 111 S.Ct. 2123 (internal citations and alterations omitted).

Because the court's inherent powers are "shielded from democratic control, they must be exercised with restraint and discretion." *Zambrano v. City of Tustin,* 885 F.2d 1473, 1478 (9th Cir.1989) (internal citations and quotations omitted). To ensure that such restraint is properly exercised, the Ninth Circuit requires that the district court make an express finding of bad faith before imposing sanctions under its inherent powers. *Id.* Bad faith conduct encompasses a range of "willful improper conduct," including taking actions that delay or disrupt litigation or hamper enforcement of a court order, or willfully abuse judicial processes. *Fink v. Gomez,* 239 F.3d 989, 992–93 (9th Cir. 2001). An improper purpose or intent is required for inherent power sanctions; inadvertent or negligent misconduct does not rise to the level of bad faith. *Id.* at 992. Sanctions are, however, permissible for reckless actions "when combined with an additional factor such as frivolousness, harassment, or an improper purpose." *Id.* at 994. For instance, an attorney's reckless misstatements of law and fact may be sanctionable when coupled with an attempt to influence or manipulate proceedings to gain a tactical advantage. *Id.* The court may not impose a fee award based solely upon a finding of bad faith in the conduct underlying the lawsuit. *Rodriguez v. U.S.,* 542 F.3d 704, 712 (9th Cir.2008) (citing *Ass'n of Flight Attendants v. Horizon Air Indus.,* 976 F.2d 541, 550 (9th Cir.1992)). It may, however, consider the "totality of the circumstances, including conduct prelitigation and during trial, when making bad faith determinations." *Id.* (internal quotations omitted).

### b) Bad Faith Conduct

After careful review of the record during the course of these proceedings, as well as consideration of the conduct underlying the litigation, the Court finds that this is the exceptionable case where an award of bad faith fees is necessary to compensate Plaintiffs for needless and improper delay and to restore the dignity of the Court. Defendants' course of bad faith conduct began prior to the initiation of litigation, with the affirmative refusal to transfer Ms. Guerra's file to the appropri-

ate USCIS office despite over a dozen requests by counsel, the denial of Ms. Guerra's NACARA and asylum applications based on an interview no-show despite the agency's failure to notify Ms. Guerra that her request for continuance had been denied, and its service on her of an NTA that USCIS failed ever to file. USCIS' persistent delay and willful inaction thwarted the adjudication of Ms. Guerra's application on its merits, leading to the initiation of this lawsuit solely to dislodge Ms. Guerra's file from the seemingly apathetic talons of the S.F. Asylum Office.

Here, Defendants' prelitigation misconduct is relevant to a finding of bad faith in so far as it instigated and reflects the pattern of willful misconduct that continued throughout the course of litigation. *See Rodriguez*, 542 F.3d at 712. First, USCIS recklessly rendered an initial I–612 decision on September 14, 2009 without considering the evidence in Ms. Guerra's record. USCIS' recklessness is apparent on the face of its decision, which erroneously identifies Ms. Guerra as a Chinese national, misrepresents her date of entry, and charges her with failing to file evidence of medical hardship despite a record replete with such evidence. *See* SAC, ¶ 81. While such recklessness alone is insufficient to justify fees, *see Fink*, 239 F.3d at 992, Defendants' additional conduct exhibited an improper purpose to manipulate the record and abuse the judicial process sufficient to justify a fee award. For instance, USCIS manipulated the Administrative Record by substituting a revised USCIS waiver decision dated September 17, 2009, without timely serving it on the Court or the Plaintiffs. Despite the Court's directive to Defendants to provide Plaintiffs with a complete Administrative Record, consisting of "all documents and materials directly or indirectly considered by agency decision-makers," including those adverse to the agency's position, Dkt. # 67 (quoting *Thompson v. U.S. Dep't*

*of Labor*, 885 F.2d 551, 555–56 (9th Cir. 1989)), USCIS neglected to incorporate its erroneous decision into any AR filed with the Court.

Further, Defendants consistently misrepresented to the Court and to Plaintiffs the scope of evidence considered by USCIS and by the Department of State in adjudicating Ms. Guerra's hardship waiver. For instance, congruent with Defendants' second motion to dismiss, filed just after Plaintiff's motion to supplement the record, Defendants filed with the Court a declaration by USCIS Officer Christiana Knasiak, who testified that USCIS forwards a complete copy of the Form I–612 together with "all documentation and evidence submitted by the alien in support of his or her waiver request," to the State Department's Waiver Review Decision. Dkt. # 36, Ex. C, ¶ 8. The understanding that the Department of State bases its waiver decision on a complete review of the applicant's record evidence was further corroborated by declaration of a DOS employee, Jeffrey Gorsky, who testified that Ms. Guerra's file at DOS included "extensive medical documentation submitted by Ms. Guerra relating to her husband's medical condition" and that DOS's denial memorandum "quotes directly from the supplemental medical report of Ms. Guerra's spouse, and cites Ms. Guerra's claim to have returned to Honduras for several months." *Id.* at Ex. A, ¶¶ 5, 9. The misleading character of these declarations became apparent only upon Defendants' filing, pursuant to Court Order, of a supplemental DOS Administrative Record containing only 162 pages, in contrast to the 530 page record filed by USCIS. *Compare* Dkt. # 34 (USCIS AR) *with* Dkt. # 70 (DOS AR). Critically, the DOS record lacks the "denial memorandum" that Mr. Gorsky discussed at length as evidence of DOS' deliberative process. This vast discrepancy between the USCIS and

DOS records suggests that Defendants either willfully misled the Court as to the scope of evidence considered by DOS through sworn affidavits or hampered enforcement of the Court's Order to supplement the record with all materials directly or indirectly considered by the agency.

Further, upon reply to the instant Motion for Attorneys' Fees, Defendants for the first time assert that the Department of State is precluded by regulation from considering any medical evidence in reaching its waiver determination. *See* Dkt. # 112, p. 8. Defendants now assert that DOS interprets the governing regulation, 22 C.F.R. § 41.62(b)(2)(ii), to limit its waiver adjudication to "program, policy, and foreign relations aspects," without any consideration of USCIS's hardship determination or of the medical records submitted by the applicant. *Id.* at pp. 8–9. This position conflicts with the earlier representations by Gorsky and Knasiak, as well as Defendants' admission in their Answer to Plaintiffs' Second Amended Complaint that DOS construes the regulations to require that it "balance" hardship with program and policy objectives. *See* Dkt. # 56 (Answer), ¶ 61. Regardless of whether DOS is actually precluded from considering hardship evidence, Defendants' patent shifting of litigation positions through these proceedings abuses the judicial process and manifests an intent to mislead Plaintiffs and the Court.

While Plaintiffs' claims were ultimately rendered moot by USCIS' reopening of Ms. Guerra's asylum application, the Court may still assess fees based on Defendants' bad faith conduct during litigation. *See Chambers,* 501 U.S. at 53, 111 S.Ct. 2123. Here, the Court is persuaded that the totality of the circumstances shows that Defendants acted with bad faith prior to and, most critically for the purposes of the instant Motion, during the course of these proceedings. Defendants' bad faith conduct has impaired the integrity of the judicial process while causing repeated and needless delays in the adjudication of Ms. Guerra's applications for adjustment of status. Plaintiffs attest, and the Court has no reason to doubt, that Mr. Trabanino's medical condition was exacerbated by Defendants' misconduct. Under these circumstances, an award of bad faith fees is just and necessary.

### c) Amount of Fees Attributable to Bad Faith Conduct

 The court may award bad faith attorneys' fees at market rates for the entire course of litigation, or a portion thereof, including time spent preparing and defending motions for attorneys' fees. *Brown v. Sullivan,* 916 F.2d 492, 497 (9th Cir.1990). The fees awarded for the various phases of litigation must be "in some way traceable" to the bad faith conduct found by the court. *Id.; see also Rodriguez,* 542 F.3d at 713 (remanding for determination as to what fees are traceable to the government's bad faith conduct). The court assesses fees by performing a lodestar computation, multiplying the number of compensable hours reasonably spent by the reasonable market rate. *See Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The resulting lodestar figure can be reduced or enhanced based on a number of "*Kerr* factors," such as the novelty and complexity of the issues involved and the reputation and experience of the attorneys working on the case. *See Fischer v. SJB–P.D., Inc.,* 214 F.3d 1115, 1119 (9th Cir.2000).

 While it appears that the instant litigation would never have been filed but for Defendants' bad faith conduct, including their inexcusable mismanagement of and refusal to adjudicate Ms. Guerra's waiver applications, the Court is mindful of the mandate that it exercise its inherent

powers with discretion and restraint. Accordingly, the Court assesses attorneys' fees only for those portions of the total proceedings that it finds to be attributable to Defendants' bad faith conduct. Compensable activities include those attendant to the initiating of this litigation, filing of a First Amended Complaint based on the denial of Plaintiff's waiver application without consideration of record evidence, and proceedings to compel Defendants to file complete Administrative Records. *See* Dkt. # 104, Ex. B. The Court also finds that time spent drafting and preparing the instant Motion is compensable, though it finds the over 100 hours spent by Plaintiffs' counsel on reply to be duplicative and excessive. *See* Dkt. # 120, Ex. A. As to this latter request for fees, the Court awards only those incurred directly in drafting the reply, which was relevant to Defendants' bad faith conduct in that it revealed the continuing inconsistencies in Defendants' litigation position, and excludes the many hours spent in conference and on research.[1] The Court excludes from its fee award those hours attributable to Plaintiffs' ultimately withdrawn motion for summary judgment, to defending against Defendants' motion to dismiss (which the Court found to be largely meritorious), to filing Plaintiffs' Second Amended Complaint upon direction of the Court, and to staying the case pending settlement negotiations and adjudication of Ms. Guerra's reopened asylum application.

To derive the lodestar figure, the Court multiplies these compensable hours by reasonable rates charged by counsel. Defendants have not objected to counsels' rates, and the Court finds them to be reasonable in light of the complexity of this case and the rates charged by similarly experienced counsel in this jurisdiction. *See* Dkt. # 104, Exs. C–F. Performing this calculation, the Court awards Plaintiffs a total of $56,193.00 in attorneys' fees. The Court finds no reason to adjust this award based on any *Kerr* Factors.

### CONCLUSION

For the foregoing reasons, the Court hereby ORDERS that Plaintiffs' Motion for Attorneys' Fees (Dkt. # 104) is GRANTED in part. Plaintiffs are entitled to an award of $56,193.00 in attorneys' fees attributable to Defendants' bad faith conduct in this action.

---

1. As the Court provided an opportunity at oral argument for Defendants to respond to evidence that Plaintiffs introduced for the first time upon reply (*see* Dkt. # 120, Exs. 1–8), the Court denies Defendants' motion to strike this material. *See* Dkt. # 122. However, in recognition that the submission of materials via reply brief unfairly deprives the opposing party of an opportunity to fully respond, *see, e.g., Schneider v. Twin City Fire Insurance Co.,* 2011 WL 5592588, *4 (W.D.Wash.2011), the Court declines to award attorneys fees associated with preparing the improperly filed exhibits.