**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARIA RAQUEL RODRIGUEZ;
ROBERTO RODRIGUEZ; JUAN LUIS
RODRIGUEZ; YOLANDA TAPIA;
GRISELDA RODRIGUEZ, through her
next friend MARIA RAQUEL
RODRIGUEZ,
        *Plaintiffs-Appellees,*

        v.

UNITED STATES OF AMERICA; JOHN
HOFFMAN; THEODORE THOMPSON;
ROBERT OLIVER; MANUEL VASQUEZ,
all substituted for United States of
America,
        *Defendants-Appellants.*

No. 07-55241

D.C. No.
CV-99-11821-CBM

OPINION

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, District Judge, Presiding

Argued and Submitted
July 18, 2008—Pasadena, California

Filed September 4, 2008

Before: Barry G. Silverman, Johnnie B. Rawlinson, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

12287

**COUNSEL**

Peter R. Maier, United States Department of Justice, Washington, D.C., for the defendants-appellants.

Gladys Limón, Mexican American Legal Defense and Education Fund, Los Angeles, CA & Janice Mac Avoy, Fried, Frank, Harris, Shriver and Jacobson LLP, New York, NY, for the plaintiffs-appellees.

---

## OPINION

MILAN D. SMITH, JR., Circuit Judge:

Plaintiffs-Appellees, five members of the family of Maria Rodriguez (the Rodriguez family), sued the United States following an attempt by four federal immigration officers to execute an administrative warrant for the arrest and removal of Marisela Rodriguez-Wence at the Rodriguez family's home (the Operation). After a bench trial, the district court entered judgment for the Rodriguez family on some of its claims against the United States under the Federal Tort Claims Act (FTCA) and awarded the Rodriguez family a total of $230,000 in damages. The Rodriguez family moved for attorney's fees under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(b). The district court awarded the Rodriguez family $917,684.82 in fees on the grounds that the government litigated a number of issues in bad faith and that the government's pre-litigation conduct was in bad faith. The government now appeals the fee award. We affirm, in part, reverse, in part, and remand to the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  Pre-Operation Investigation

Before attempting to arrest Rodriguez-Wence at the Rodriguez family's home on Piedmont Street in Oxnard, California, Thompson, the officer in charge of the operation, reviewed the file on Rodriguez-Wence maintained by the former Immigration and Naturalization Service (INS). The file included

identifying information such as a physical description, a driver's license number and picture, and Rodriguez-Wence's social security number. The file also contained two addresses for Rodriguez-Wence, neither of which was on Piedmont Street. In fact, the INS had over fifteen possible addresses for Rodriguez-Wence, none of which was on Piedmont Street.

Thompson also searched records maintained by the California Department of Motor Vehicles in an attempt to determine Rodriguez-Wence's location. In his first search, he entered "Marisela Rodriguez-Wence" and her date of birth. The search yielded an address other than the Piedmont Street address. Thompson then entered the name "Marisela Rodriguez" with no date of birth and obtained a result for "Marisela Rodriguez V" at the Piedmont Street address. The search also revealed the make, model, and license plate of the car registered to Marisela Rodriguez V.[1] But Thompson does not recall comparing any of the identifying information he had about Rodriguez-Wence with information about Marisela Rodriguez V, nor did any officer conduct surveillance or attempt to contact the occupants at the Piedmont Street address to determine if Rodriguez-Wence resided there.

## B. The Operation

At about 4:30 a.m. on the morning of the Operation, Thompson met with three other INS officers (Hoffman, Oliver, and Vazquez). He showed them a photograph of Rodriguez-Wence and told them of the vehicles registered to her. He also told the officers that they were required to obtain consent before entering the home on Piedmont Street. Around approximately 5:00 a.m., while it was still dark, the four officers approached the front door of the Rodriguez family's

---

[1]Marisela Rodriguez V is the daughter of Roberto and Maria Rodriguez, and has no relation to Marisela Rodriguez-Wence. At the time of the Operation, Marisela Rodriguez V did not reside at the Rodriguez family's home.

home and woke the family by yelling and pounding on the front door. Maria and Roberto Rodriguez and four children (ranging from ages two to twenty-one) were asleep in the house at the time the officers arrived.

When Maria arrived at the door, the officers told her it was the police and ordered her to open the door. Maria opened the door slightly and saw four armed men. According to Maria, the officers did not show their credentials or tell Maria or anyone else that they were from the INS or why they were there. Thompson believed that Maria was thirty or thirty-one years old, and Hoffman thought she was between thirty-five and fifty-five years old and had a "fairly slender, medium build." Based on the information available to the INS, Rodriguez-Wence, the target of the operation, was twenty-six years old, five feet tall, and 160 pounds.

Maria, who speaks only Spanish, testified that she told the officers to wait so she could get dressed and obtain the help of an English-speaking family member. According to Maria, after she told the officers to wait, she turned and the officers followed her into the house. Maria testified that she did not explicitly tell the officers they could not come in, but that they did not ask for permission to enter. When Maria noticed the men had entered the home, she was too scared and nervous to say anything. According to Maria, as she approached her bedroom, she encountered her daughter Yolanda who asked what was going on, and Thompson ordered Yolanda to "shut up and go sit down in the living room."

The officers' various accounts of whether they had consent to enter are, however, less than clear. According to Thompson's trial testimony, Hoffman requested permission to enter in Spanish, Maria consented, and Yolanda appeared at the door less than a minute later and also consented before the officers entered the house. In an earlier incident report, Thompson claimed that Maria gave consent to enter. But in a sworn interview, Thompson stated that Maria answered the

door and Yolanda consented to their entry; he recalled that he spoke to Maria in English and she appeared confused. In response to an interrogatory, Thompson answered that Maria consented to the officers entering her home. At his deposition in 2002, Thompson testified that Maria answered the door, that Hoffman asked for permission to enter in Spanish, and then Yolanda appeared and gave consent to enter.

At trial, Hoffman testified that he asked Maria in Spanish if the officers could come in and she, not Yolanda, gave the officers permission to enter by responding "si." In an earlier interview, Hoffman stated that it was Yolanda that gave consent. Vasquez, who is fluent in Spanish, testified that Hoffman asked for permission to enter in Spanish and Maria said "yes"; Vasquez believed she said "yes" in English. And Oliver testified that Maria gave permission to enter by saying "si."

## C.   Post-Operation Litigation

The Rodriguez family sued the United States and the INS officers. The government successfully narrowed the claims against the individual defendants prior to filing for summary judgment, and the district court granted, in part, the government's motion for partial summary judgment dismissing certain claims against the four officers and the United States.

The court held a bench trial on the FTCA claims, and the United States asserted, among other defenses, that the officers were privileged to enter the home, that they obtained consent to enter, and that the members of the Rodriguez family were contributorily negligent based on their actions when the officers arrived. The district court entered judgment against the United States and in favor of the Rodriguez family, awarding the family a total of $230,000 in damages.

The Rodriguez family filed a motion for attorney fees under the EAJA. The district court first concluded that the

government's argument that the officers' entry was privileged because they had reasonable suspicion to believe that Rodriguez-Wence would be at the Rodriguez family's home was reckless and frivolous. The district court similarly found that the government's argument that the officers had consent to enter the home was likewise reckless and frivolous. Finally, the district court concluded that the government's pre-litigation conduct was also in bad faith.**²** The court awarded the Rodriguez family a total of $917,684.82 in attorney fees.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to review a district court's award of attorney fees under 28 U.S.C. § 1291, and we review a district court's decision regarding the amount of an award of fees under the EAJA for abuse of discretion. *Brown v. Sullivan*, 916 F.2d 492, 495 (9th Cir. 1990). We review a district court's finding regarding a party's bad faith for clear error. *Cazares v. Barber*, 959 F.2d 753, 754 (9th Cir. 1992); *Brown*, 916 F.2d at 495.

## DISCUSSION

### A.  The Equal Access to Justice Act

**[1]** Under the EAJA, "a court may award reasonable fees and expenses of attorneys . . . to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her

---

**²**The district court also concluded, in a footnote, that the government's defense of contributory negligence was frivolous because it attempted to shift the duty of proving consent to the occupant of the home. The government did not argue in its opening brief that the district court erred in concluding that its defense of contributory negligence was frivolous; thus, the government has waived that argument on appeal. *See Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999). We also do not address whether any "exigent circumstances" argument was in bad faith because the district court did not base its fee award on that argument.

official capacity . . ." 28 U.S.C. § 2412(b). The EAJA further provides that the "United States shall be liable for such fees and expenses *to the same extent that any other party would be liable under the common law . . .*" *Id.* (emphasis added). The common law allows a court to assess attorney's fees against a losing party that has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991) (citations and internal quotations omitted). The EAJA's explicit incorporation of the common law in its attorney's fees provision is a clear indication that in all cases, including those sounding in tort, we hold the government to the same standard of good faith that we demand of all non-governmental parties.[3]

**[2]** Under the common law, "[a] finding of bad faith is warranted where an attorney 'knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent.' " *Primus Auto. Fin. Servs, Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997) (quoting *In re Keegan Mgmt. Co.*, *Sec. Litig.*, 78 F.3d 431, 436 (9th Cir. 1996)). Mere recklessness does not alone constitute bad faith; rather, an award of attorney's fees is justified when reckless conduct is "combined with an additional factor such as frivolousness, harassment, or an improper purpose." *Fink v. Gomez*, 239 F.3d 989, 993-94 (9th Cir. 2001). "A frivolous case is one that is groundless . . . with little prospect of success; often brought to embarrass or annoy the defendant. The case is frivolous when the government's position was foreclosed by binding precedent or so obviously wrong as to be frivolous." *United States v. Manchester Farming P'ship*, 315

---

[3]The EAJA also authorizes the payment of attorney's fees and other expenses to a prevailing party "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A). This provision does not apply to cases "sounding in tort." *Id.*

F.3d 1176, 1183 (9th Cir. 2003) (citation and internal quotations omitted).[4]

In contesting the award of attorney's fees, the government argues that the district court's finding of bad faith was clearly erroneous with respect to the defenses of consent and privilege. The government also contends that the district court relied excessively on the government's pre-litigation conduct, and that the government's other successes in the litigation support that it did not act in bad faith. We address each of these arguments in turn.

## B.   Defense of Consent

In the district court, the government argued that the officers had consent to enter the Rodriguez family's home.[5] The district court cited this part of the government's case as one aspect of its bad faith. We disagree. The record shows that the government had some factual support for its argument that the officers obtained consent before entering the Rodriguez family's home; thus, we conclude that the district court clearly erred in holding that the government's defense of consent demonstrated bad faith.

The government's defense of consent was supported by the admissible testimony of several percipient witnesses; there-

---

[4]The government suggests that an argument must be both objectively and subjectively frivolous, but we have previously required only that an argument be objectively frivolous. *See United States v. Sherburne*, 249 F.3d 1121, 1126 n.4 (9th Cir. 2001) ("Unlike the term 'frivolous,' the term 'vexatious' has both a subjective and an objective component.").

[5]It is, of course, well established that consent to search is an "exception to the Fourth Amendment's prohibition of warrantless searches of homes." *United States v. Enslin*, 327 F.3d 788, 793 (9th Cir. 2003). The consent, however, must be valid. *See United States v. Shaibu*, 920 F.2d 1423, 1425 (9th Cir. 1990). The Rodriguez family has not argued that it was frivolous for the government to raise the defense of consent on any basis other than a lack of facts to support that someone consented to the officers' entry.

fore, we cannot conclude that it was "so obviously wrong" or so lacking in support that it was "groundless." *See Manchester Farming P'ship*, 315 F.3d at 1183 (stating that a "frivolous [argument] is one that is groundless," and an argument is groundless if it is "foreclosed by binding precedent or . . . obviously wrong"); *see also* Oxford English Dictionary (2d ed. 1989) (defining "groundless" as "[d]estitute of foundation, authority, or support; having no real cause or reason; unfounded"). It is true that the accounts of the officers relating to consent varied. Most notably, Thompson stated on one occasion that both women consented to their entry, on other occasions that Maria gave consent, and on yet another occasion that only Yolanda gave the officers consent. Though Thompson's accounts are inconsistent, the three other officers agree that Hoffman asked Maria for consent to enter in Spanish. And these three officers all testified that Maria consented to their entry, with two of the officers testifying that her consent was given in Spanish and one who "believes" her consent was given in English. Of these three officers, only Hoffman had previously contradicted his testimony by testifying, in an earlier interview, that it was Yolanda who gave consent.

**[3]** Thus, while the factual support for the government's defense of consent was weakened by inconsistencies and contradictions, the theory that Maria consented to the officers' entry was supported by competent testimony. As a result, if the district judge found the testimony of certain officers credible, it could have concluded that Maria consented to the officers' entry. *See United States v. Lindberg*, 220 F.3d 1120, 1125 (9th Cir. 2000) (affirming the district court's conclusion that the government's arguments were not vexatious or frivolous when there was evidence from which the jury could infer that the defendant had the requisite knowledge). For this reason, we cannot conclude that the government's defense of consent was "groundless."

**[4]** We also conclude that the district court's determination that the government's defense of consent was in bad faith

rises to the level of clear error. Reversal for clear error requires "a definite and firm conviction" that the district court made a mistake. *United States v. Asagba*, 77 F.3d 324, 326 (9th Cir. 1996). Here, it was the Rodriguez family's burden as the prevailing party to show the government's bad faith. *Espinoza-Gutierrez v. Smith*, 94 F.3d 1270, 1279 (9th Cir. 1996). But the Rodriguez family's only argument to support bad faith with respect to the government's consent defense is that the defense lacked factual support. And, for the reasons described above, that argument is not only unpersuasive, but also based on an inaccurate reading of the officers' testimony. Moreover, awarding fees based on bad faith "is punitive and should be imposed 'only in exceptional cases and for dominating reasons of justice.' " *Id.* (quoting *Brown*, 916 F.2d at 495). Because the government had at least some testimony from witnesses who were at the scene of the Operation to support its defense of consent, "dominating reasons of justice" did not require a finding of bad faith.

## C.   Defense of Privilege

The government also argued in the district court that the officers' conduct in detaining and questioning the Rodriguez family was "privileged" because they had a reasonable suspicion based on specific articulable facts that they would find Rodriguez-Wence in the Rodriguez family's home.[6] The dis-

---

[6]On appeal, the parties do not brief in any detail the legal basis for the government's defense of privilege. The district court's order suggests that the government argued, citing 8 C.F.R. § 287.8 and California Civil Code § 43.55, that the officers' conduct was privileged because the officers had a reasonable suspicion that someone at the Rodriguez family's home was an alien or engaged in an offense against the United States. *See* 8 C.F.R. § 287.8 ("An arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States."); Cal. Civ. Code § 43.55 ("There shall be . . . no cause of action . . . against, any peace officer who makes an arrest pursuant to a warrant of arrest regular upon its face if the peace officer in making the arrest acts

trict court concluded that "it was reckless and frivolous for the Government to attempt to argue that the officers had a reasonable suspicion given the perfunctory search." This conclusion was not clearly erroneous.

The record does not support that the officers' pre-Operation investigation gave the officers specific reasons to believe that they would find Rodriguez-Wence at the Rodriguez family's home. The only evidence even remotely connecting Rodriguez-Wence to the Piedmont Street address was Thompson's search that was not based on Rodriguez-Wence's full name or any other identifying information. And that search yielded a name that is materially different from "Marisela Rodriguez-Wence." Moreover, although the difference in names concerned Thompson, he neglected to compare identifying information associated with these names, such as driver's license numbers, despite his ability to do so.

**[5]** Other evidence in the record supports strongly that Rodriguez-Wence would not be found at that address. The INS had a number of other addresses for Rodriguez-Wence, none of which matched the Piedmont Street address. And no efforts were made to verify that Rodriguez-Wence lived at the Piedmont Street address before the Operation. Here, the district court concluded that government's defense of privilege was so lacking in support that it constituted bad faith and the record supports that conclusion. *See Lindberg*, 220 F.3d at 1124 (stating that deference to a district court's finding of bad faith is particularly appropriate because the "district court hears evidence from the beginning" and can best determine whether a party's argument "is so lacking in support that it

without malice and in the reasonable belief that the person arrested is the one referred to in the warrant."). We need not pass on the applicability or merits of this defense in this appeal. Rather, we consider only whether the district court abused its discretion in concluding that, as presented by the government, this argument constituted bad faith.

can only be . . . in bad faith"). Thus, the district court's finding of bad faith with respect to the defense of privilege was not clearly erroneous.

### D.   Pre-litigation Conduct

[6] The government also argues that the district court relied excessively on the government's pre-litigation conduct in finding bad faith. The district court did discuss the conduct underlying the litigation—the unreasonably perfunctory search, a failure to follow INS policy requiring consent to enter the home, and the officer's conduct during the entry and search of the home—in finding bad faith. But the district court correctly recognized that an award of attorney's fees is not appropriate when it is "based *solely* upon a finding of bad faith in the conduct underlying the lawsuit." *Ass'n of Flight Attendants v. Horizon Air Indus.*, 976 F.2d 541, 550 (9th Cir. 1992) (emphasis added). In *Association of Flight Attendants*, this court noted that no circuit court has shifted attorney fees based "*solely* upon a finding of bad faith as an element of the cause of action presented in the underlying suit," but recognized a possibility that "prelitigation conduct might be relevant to an award of fees for bad faith conduct during the litigation." *Id.* at 549-50. We have previously approved of district courts considering the "totality of the circumstances," including conduct "*prelitigation* and during trial," when making bad faith determinations. *See Cazares*, 959 F.2d at 755 (quoting *Rawlings v. Heckler*, 725 F.2d 1192, 1196 (9th Cir. 1983) (emphasis added)). In this case, the pre-litigation conduct was only one of several grounds on which the district court granted attorney's fees. As a result, we conclude that the district court did not excessively rely on the government's pre-litigation conduct.

The government also contends that the district court did not pay sufficient attention to other aspects of the government's litigation conduct, including the fact that it narrowed the claims for trial and limited the damages, which, according to

the government, demonstrates that it litigated zealously but not in bad faith. This approach would, in effect, absolve the government of responsibility for bad faith litigation conduct because, at various points during the many years this case was litigated, it achieved some success. We hold that it is unnecessary to find that every aspect of a case is litigated by a party in bad faith in order to find bad faith by that party.

## E. Remedy

**[7]** The district court explicitly based its conclusion that the Rodriguez family was entitled to $917,684.82 in attorney's fees on numerous aspects of the government's case that, together, constituted bad faith—specifically, the government's litigation of the issues of consent, privilege, and contributory negligence in bad faith and the government's pre-litigation conduct. Nothing in the district court's order confirms that had it based its decision on a few, but not all of these grounds, it would have granted a fee award in the same amount. And, while it is true that the district court concluded that no specific portions of the litigation were unaffected by the government's bad faith, this statement was premised on its clearly erroneous finding that the government's litigation of its primary defense, the defense of consent, was in bad faith. Thus, even though the court may award fees for the entire course of litigation "if it finds that the fees incurred during the various phases of litigation are in some way traceable to the . . . bad faith," *Brown*, 916 F.2d at 497, we cannot determine from the record exactly what fees are traceable to the government's bad faith when the defense of consent is removed from the calculation. Moreover, the district court is in the best position to make this determination. *Cf. id.* (concluding that the district court erred in not finding bad faith and remanding so that the district court could exercise its discretion to award attorney's fees "in some way traceable to the . . . bad faith). On this basis, we remand to the district court so that it may consider what, if any, modification of the fee award is appropriate in light of this opinion.

## CONCLUSION

The opinion of the district court is AFFIRMED, in part, REVERSED, in part, and REMANDED to the district court for reconsideration in light of this opinion. Each party shall bear its own costs on appeal.