# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-40585

United States Court of Appeals
Fifth Circuit

**FILED**
July 2, 2015

Lyle W. Cayce
Clerk

GATE GUARD SERVICES, L.P.; BERT STEINDORF,

Plaintiffs - Appellees Cross-Appellants

v.

THOMAS E. PEREZ, SECRETARY, DEPARTMENT OF LABOR,

Defendant - Appellant Cross-Appellee

Appeals from the United States District Court
for the Southern District of Texas

Before JONES and HAYNES, Circuit Judges, and CRONE, District Judge.[*]

EDITH H. JONES, Circuit Judge:

It is often better to acknowledge an obvious mistake than defend it. When the government acknowledges mistakes, it preserves public trust and confidence. It can start to repair the damage done by erroneously, indeed vindictively, attempting to sanction an innocent business. Rather than acknowledge its mistakes, however, the government here chose to defend the indefensible in an indefensible manner. As a result, we impose attorneys' fees in favor of Gate Guard as a sanction for the government's bad faith. 28 U.S.C. § 2412(b).

---

[*] District Judge of the Eastern District of Texas, sitting by designation.

No. 14-40585

At nearly every turn, this Department of Labor ("DOL") investigation and prosecution violated the department's internal procedures and ethical litigation practices. Even after the DOL discovered that its lead investigator conducted an investigation for which he was not trained, concluded Gate Guard was violating the Fair Labor Standards Act ("FLSA") based on just three interviews, destroyed evidence, ambushed a low-level employee for an interview without counsel, and demanded a grossly inflated multi-million dollar penalty, the government pressed on. In litigation, the government opposed routine case administration motions, refused to produce relevant information, and stone-walled the deposition of its lead investigator.

For this misbehavior, the district court awarded Gate Guard attorneys' fees under the Equal Access to Justice Act's ("EAJA") substantially-justified provision, 28 U.S.C. § 2412(d), but denied fees under the EAJA's bad faith provision, 28 U.S.C. § 2412(b). On appeal, the government acknowledges that "mistakes were made" but insists that an attorneys' fee award is unjustified. The partial concession, although welcome, is too little, too late. We hold that attorneys' fees are appropriate under the EAJA's bad faith provision and, therefore, **REVERSE** and **REMAND** for further proceedings.

## BACKGROUND

Gate Guard contracts with oil companies to provide gate attendants for remote drilling sites. R. 9776. The attendants remain at the drill sites, recording the license plates of vehicles entering and leaving the oil field twelve to twenty-four hours a day. *Id.* Because many locations are isolated, attendants often live on-site and Gate Guard employs service technicians to deliver supplies. R. 9039. Gate Guard considers the attendants independent contractors and pays them between $100 and $175 per day. *Id.*

In July 2010, DOL investigator David Rapstine received a tip from Jerry Studlar, a former Gate Guard service technician and drinking companion of

2

Rapstine. R. 9777. Studlar was concerned that Gate Guard had miscalculated his wages. After Rapstine spoke with Studlar, another former service technician, and a gate attendant, he suspected that Gate Guard misclassified its gate attendants as independent contractors instead of employees under the FLSA. *Id.* If that were true, Gate Guard would be violating the FLSA by not paying attendants overtime and keeping accurate records of the hours they worked.

Later that month, Rapstine who had little training or experience in contractor misclassification cases, opened a formal investigation into Gate Guard's employment practices.[1] On July 15, 2010 Rapstine notified Gate Guard that he was beginning an investigation. R. 9777. Rapstine and Gate Guard scheduled an opening conference for July 29. *Id.* A week before the opening conference, however, Rapstine appeared unannounced at Gate Guard's offices. *Id.* Although he knew that Gate Guard was represented by counsel, Rapstine confronted a low-level Gate Guard employee by announcing his presence and demanding payroll information. R. 8168. Rapstine himself admitted this was very unusual; during his ten-year career, he had never shown up unannounced before an opening conference. R. 8175; 8285-86.

Rapstine returned to Gate Guard's offices on July 29th for the previously scheduled opening conference. R. 9777. What happened during the conference is unclear. Afterward, however, Rapstine sent an email to a colleague involved in the investigation saying: "Wish you could have been there, it was a good example of being quiet and letting them do all the talking and consequently, digging their own grave." R. 9276. Without further investigation and after

---

[1] Of the 400 investigations Rapstine conducted, only five were contractor misclassification cases. R. 3973. Rapstine's personnel file showed no training in contractor misclassification cases. *Id.* And he could only recall reviewing a single memo discussing contractor misclassification cases. *Id.*

conducting only three interviews, Rapstine began calculating the potential penalty. He concluded that Gate Guard owed over $6 million in back wages, nearly the company's entire net worth. R. 9778.

Rapstine then began interviewing other gate attendants to support his conclusion. R. 9777. According to Rapstine, he took handwritten notes during each of these interviews and used them to compose formal witness interview statements. Once he had produced the statements, he destroyed his notes—either by shredding them or placing them in a "burn barrel." *Id.* There is no indication that this was Rapstine's normal practice and he provided no explanation for his actions. Even if the record of these interviews were available, they would be of little use: Rapstine interviewed only a fraction of the 400 affected gate guards. *Id.*

What we know of the interviews shows that, at a minimum, Rapstine's investigation was cursory. Rapstine failed to ask basic questions relevant to the attendants' FLSA classification, such as whether they declared themselves as independent contractors on their tax returns, whether Gate Guard guaranteed them additional work, whether they maintained and repaired their own equipment, or whether they worked for Gate Guard's competitors. R. 3975-76. Even when Rapstine asked relevant questions, he ignored or discounted responses that contradicted his conclusion. *Id.* For instance, Rapstine ignored that Gate Guard did not supervise attendants and that attendants found their own relief workers, were not restricted from working with competitors, and were not evaluated or disciplined based on performance. R. 3976.

On October 4, Rapstine presented his findings to Gate Guard. R. 9777. Based on only seventeen interviews, Rapstine concluded that Gate Guard misclassified 400 gate attendants as independent contractors and, therefore, failed to abide by the FLSA's minimum wage and overtime requirements.

R. 9777-78.  As a penalty, Rapstine demanded Gate Guard pay over $6 million in back wages and unpaid overtime.  *Id*.  Going forward, Rapstine insisted that Gate Guard pay gate attendants the federal minimum wage for every hour the attendant is on site and that Gate Guard comply with the FLSA's time-keeping requirements.  R. 9778.  Gate Guard denied any wrongdoing and refused to treat gate attendants as employees under the FLSA.

After the closing conference and in preparation for this litigation, Rapstine sent Gate Guard's file to his supervisor for review.  R. 8328.  During the review, Rapstine's supervisor found several violations of internal policy.  First, it was improper to begin back-wage computations before actually determining Gate Guard was violating the FLSA.  R. 8342.  Second, Rapstine had not followed protocol when presenting his findings to Gate Guard.  R. 8334.  In particular, Rapstine should have sought voluntary prospective compliance before demanding millions of dollars in back pay and unpaid overtime.  *Id*.  Third, Rapstine had inflated the amount of Gate Guard's penalty by $4 million dollars because, in Rapstine's erroneous view, Gate Guard must pay employees for every hour they are on site, even if that time is spent sleeping or eating.  R. 8333.

A month after the closing conference, Gate Guard met with the DOL's district director, Eden Ramirez.  R. 9778.  Ramirez informed Gate Guard that an enforcement action was imminent because Gate Guard refused to comply with the FLSA.  *Id*.  A week later, Gate Guard's counsel again met with Ramirez and two other DOL employees.  *Id*.  The DOL reasserted its position on liability, ordered Gate Guard to comply with the FLSA's minimum wage and overtime provisions, and demanded Gate Guard pay a multi-million dollar penalty.  *Id*.

No. 14-40585

**PROCEDURAL HISTORY**

On November 19, 2010, Gate Guard sued the DOL seeking a declaration that it was in compliance with the FLSA. R. 9778. Gate Guard also sought attorneys' fees under the EAJA if it prevailed. R. 41-42. Before Gate Guard served the complaint, the DOL filed its own FLSA enforcement action for back wages and injunctive relief. R. 9778. Both suits were filed in the Southern District of Texas, but in different divisions. *Id*. Gate Guard filed the declaratory judgment action in the Victoria Division; the DOL filed the FLSA enforcement action in the Corpus Christi Division. *Id*.

During litigation, the government opposed nearly every motion—even routine case administration motions—on spurious grounds and filed specious motions of its own. First, Gate Guard moved to transfer the FLSA enforcement action[2] to the Victoria Division where its declaratory judgment action was already pending. The company noted that the actions were substantially related, Victoria was the most convenient forum, and there was a possibility of conflicting judgments. R. 9779. The DOL opposed the motion to transfer, even though Victoria and Corpus Christi are less than 100 miles apart. Moreover, eighty-five of the affected gate attendants resided within the Victoria division, R. 1327, and Rapstine worked in the Victoria field office, R. 1326. DOL also argued that the two suits—both centering on whether Gate Guard violated the FLSA—were *not* substantially similar. R. 440. Unsurprisingly, the district court granted Gate Guard's motion to transfer. R. 446.

Gate Guard then moved to consolidate the FLSA enforcement and declaratory judgment actions. DOL opposed this routine motion because, *inter alia*, "consolidating the two actions will confuse the jury," R. 1330, and "consolidation would accelerate disputes between the parties, causing

---

[2] Gate Guard alternatively moved to dismiss the enforcement action. The district court denied that part of Gate Guard's motion.

6

unnecessary cost and delay," R. 1331. The consolidation motion was granted. R. 1333.

While Gate Guard's motion to consolidate was pending, the government moved to dismiss the declaratory judgment action on the grounds that there was no "final agency action" and the controversy was not "ripe." The government took this position despite the fact that DOL had conducted a "final" conference to inform Gate Guard of its findings and demanded a multi-million dollar penalty, had threatened legal action if Gate Guard did not comply, and then sued Gate Guard for enforcement. R. 1305-19. The district court denied the government's motion. R. 1333.

The government's conduct worsened as this litigation entered the discovery phase. During Rapstine's initial deposition, which lasted only forty-five minutes, DOL's lead counsel, Colleen Nabham, objected 102 times. R. 9780 n.3. Eighteen additional times Nabham instructed Rapstine not to answer basic questions related to his investigation. *Id.* As a result, Nabham spoke more during the deposition than Rapstine did. *Id.* Nabham's conduct was so disruptive, the deposition had to be stopped and Gate Guard was required to seek court supervision of future depositions. R. 9780. Gate Guard later withdrew its motion after the DOL agreed that Nabham would not defend any other depositions, that it would not coach witnesses, and that Rapstine would sit for another deposition. R. 9780.

Notwithstanding the deposition debacle, the government continued its belligerent litigation tactics. It forced Gate Guard to seek court-ordered production of the witness statements underlying this prosecution, which the government claimed were privileged. The government maintained its position even after it filed some of the same statements with the court as evidence and thereby waived any privilege. R. 9780. Gate Guard had to seek a protective order when the government sent harassing and misleading letters to gate

attendants seeking further information about their relationship with Gate Guard. R. 9780. Gate Guard also had to ask the court to seal several depositions containing trade secrets and confidential company information because the DOL unreasonably withheld its consent. R. 9780.

Meanwhile, the legal basis for the DOL's position began eroding, as the same district court held, in a nearly identical case, that gate attendants are not FLSA employees. *See Mack v. Talasek*, No. V-09-53, 2012 WL 1067398, *2 (S.D. Tex. Mar. 28, 2012). Further, the DOL continued this prosecution even after discovering that the federal Army Corps of Engineers utilizes gate attendants and classifies them as independent contractors. R. 9786. Predictably, given the legal precedents and botched investigation, the district court found the DOL's case so weak, it granted summary judgment for Gate Guard—a disposition the DOL has not appealed. *See Gate Guard Servs. L.P. v. Solis*, No. V-10-91, 2013 WL 593418, at *13-14 (S.D. Tex. Feb. 13, 2013).

Gate Guard then moved to recover attorneys' fees under the EAJA's bad faith provision, 28 U.S.C. § 2412(b). The district court surveyed the in-circuit and out-of-circuit precedent, eventually concluding that the government's conduct was not sufficiently egregious to constitute bad faith. *See Gate Guard Servs. L.P. v. Solis* (*Gate Guard I*), No. V-10-91, 2013 WL 3873275, at *6-7 (S.D. Tex. July 24, 2013). Specifically, although only one of eleven relevant facts weighed in favor of FLSA employee status, the court found that the government's position was "not entirely frivolous." *Id.* Accordingly, it denied Gate Guard's request. *Id.* In the same opinion, the court left open the possibility that Gate Guard could recover attorneys' fees under the EAJA's substantially justified provision, 28 U.S.C. § 2412(d). *Id.* Gate Guard took the hint and reframed its original fee request. *Gate Guard Servs. L.P. v. Perez* (*Gate Guard II*), 14 F. Supp. 3d 825, 828 (S.D. Tex. 2014). The district court agreed that the government's position was not substantially justified and

No. 14-40585

awarded Gate Guard over $565,000 in attorneys' fees. *Id*. at 841.  Both sides now appeal.

## STANDARD OF REVIEW

We review decisions to award or deny attorneys' fees under the EAJA for abuse of discretion. *Perales v. Casillas*, 950 F.2d 1066, 1071 (5th Cir. 1992).  A district court abuses its discretion when it relies on clearly erroneous factual findings, erroneous conclusions of law, or misapplies the factual or legal conclusions. *See Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*, 775 F.3d 242, 254 (5th Cir. 2014) (citing *N. Alamo Water Supply Corp. v. City of San Juan, Tex.*, 90 F.3d 910, 916-17 (5th Cir. 1996)).

## DISCUSSION

The EAJA provides two paths for recovering attorneys' fees from the government.  First, under 28 U.S.C. § 2412(b), the federal government may be liable for attorneys' fees "to the same extent that any other party would be liable under the common law."  The general rule in federal courts and under the common law is that litigants are responsible for their own attorneys' fees. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 257, 95 S. Ct. 1612, 1621 (1975).  Courts can, however, award attorneys' fees when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons" or when a "litigant has conferred a substantial benefit on a class of persons." *F.D. Rich Co., Inc. v. U. S. ex rel. Indus. Lumber Co.*, 417 U.S. 116, 129-30, 94 S. Ct. 2157, 2165 (1974).  Thus, § 2412(b) essentially applies these common-law bad faith and common fund exceptions to the government. *Baker v. Bowen*, 839 F.2d 1075, 1080 n.3 (5th Cir 1988).  Second, 28 U.S.C. § 2412(d) allows courts to award attorneys' fees "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust."  Section 2412(d) does not apply to high net worth individuals or

9

corporations and limits attorney compensation to $125 per hour absent special factors.  28 U.S.C. § 2412(d)(2)(A)-(B).

As noted earlier, the court awarded fees under § 2412(d) but denied them under § 2412(b).  In this appeal, the government contends that an award under § 2412(d) was inappropriate because its position was substantially justified and Gate Guard's application was untimely.  Gate Guard cross-appeals the denial of fees under § 2412(b).  Because we hold that Gate Guard is entitled to fees under § 2412(b), our discussion is limited to that provision.

## I.

Relying primarily on authority from other circuits, the district court denied fees under the bad faith exception.  *See Gate Guard I*, 2013 WL 3873275, at *4-7.  To constitute bad faith, the court explained, a party must show that: "(1) the government's position was meritless, (2) the meritlessness was known to the government, and (3) the government's position was advanced or maintained for an improper purpose, such as harassment."  *Id.* at *4 (internal citations and quotation marks omitted).  Because the government's position that gate attendants are employees was "not entirely frivolous"— meaning it was not "wholly unsupported" or "easily dispatched by cursory review of the evidence"—the court found that the government did not act in bad faith.  *Id.* at *7.  The district court's analysis has two flaws.

## A.

First, the court utilized an unduly rigid test that is unsupported by this court's precedent or the common law.  The power to award attorneys' fees for bad faith conduct " 'is part of the original authority of the chancellor to do equity in a particular situation.' "  *Hall v. Cole*, 412 U.S. 1, 5, 93 S. Ct. 1943, 1946 (1973) (quoting *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 166, 59 S. Ct. 777, 780 (1939)).  Equity, unlike law, affords courts a certain flexibility. *Holland v. Florida*, 560 U.S. 631, 650, 130 S. Ct. 2549, 2563 (2010).  Courts are

free to exercise this flexibility whenever "overriding considerations indicate the need for such a recovery" or "the interests of justice so require." *Hall*, 412 U.S. at 5, 93 S. Ct. at 1946. This sort of flexibility stands in tension with the district court's three-part test, which "if strictly applied, threaten[s] the 'evils of archaic rigidity.' " *Holland*, 560 U.S. at 650, 130 S. Ct. at 2563 (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 248, 64 S. Ct. 997, 1002 (1944)).

Consistent with the flexibility inherent in equity, this court has never articulated a mechanical three-part test like the one used by the district court. *See Perales*, 950 F.2d at 1071-72 (explaining that the "American rule" permits a fee award when the losing party acted " 'in bad faith, vexatiously, wantonly, or for oppressive reasons' " (internal citation omitted)); *Baker*, 839 F.2d at 1081-82 (same); *Batson v. Neal Spelce Assocs., Inc.*, 805 F.2d 546, 550 (5th Cir. 1986) (same). The government urges us to follow instead some other circuits' tests, similar to that of the district court, which require both frivolousness and improper purpose.[3] *See e.g.*, *Griffin Indus. Inc. v. EPA*, 640 F.3d 682, 685-86 (6th Cir. 2011) ("In order to justify such a bad faith award of attorney fees, the district court must find (1) that the position advanced or maintained by a party was meritless, (2) that the meritlessness was known to the party, and (3) that the position was advanced or maintained for an improper purpose, such as

---

[3] Although this court once implied that both frivolousness and improper purpose are necessary, that decision was unpublished. *See United States v. Medica Rents Co. Ltd.*, Nos. 03-11297, 06-10393, 07-10414, 2008 WL 3876307, at *4 (5th Cir. Aug. 19, 2008) (holding that, although there was evidence of improper purpose, "we are not convinced that the government brought claims that were either wholly unsupported or that were easily dispatched by cursory review of the evidence."). Unpublished opinions are not binding on this court. 5th Cir. R. 47.5. Further, *Medica Rents*'s holding is inconsistent with this court's earlier published decision in *Baker*, which allows recovery when a party has abused the judicial process. *See* 839 F.2d at 1081-82. Because no panel of this court can overrule a prior decision, our earlier published decision in *Baker* remains the law in this circuit. *See Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008) (discussing the rule of orderliness).

harassment."); *FTC v. Kuykendall*, 466 F.3d 1149, 1152 (10th Cir. 2006) ("In order to fall within the exceedingly narrow bad faith exception to the general rule, there must be clear evidence that the challenged claim "is entirely without color and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons."); *Kerin v. United States Postal Serv.*, 218 F.3d 185, 190 (2d Cir. 2000) ("[N]either meritlessness alone nor improper purpose alone will suffice."); *but see Rodriguez v. United States*, 542 F.3d 704, 709 (9th Cir. 2008) (holding that fees are recoverable when a party "argues a meritorious claim for the purpose of harassing an opponent").

These conjunctive tests appear to lack the flexibility equity requires and overlook that the common-law rule allows for attorneys' fees disjunctively whenever a party has "acted in bad faith, *vexatiously, wantonly, or for oppressive reasons.*" *Alyeska Pipeline*, 421 U.S. at 257, 95 S. Ct. at 1621; *F.D. Rich*, 417 U.S. at 129, 94 S. Ct. 2165; *Hall*, 412 U.S. at 5, 93 S. Ct. at 1946 (emphasis added). Although the first three terms articulated in *Alyeska Pipeline* may require a party's position to be frivolous,[4] the last does not. As a result, this court's position is similar to that of the Ninth Circuit that a "finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." *Rodriguez*, 542 F.3d at 709 (internal quotation marks and

---

[4] Few courts have explored the difference, for purposes of attorneys' fees, between conduct that is in bad faith, vexatious, or wanton. Each requires the litigant's position to be objectively frivolous. The difference between them, however, turns on the subjective knowledge or motivation of the individual. Bad faith implies that a litigant intentionally took a position he subjectively knew was unfounded. BRYAN A. GARNER, BLACK'S LAW DICTIONARY 166 (10th ed. 2014) (defining bad faith as "dishonesty of belief, purpose, or motive"). Vexatious conduct implies not only that a litigant knew a position was unfounded, but that his purpose was to "create trouble or expense" for the opposing party. *Id.* 1796. Finally, wantonness suggests that a litigant has recklessly pressed an objectively frivolous position. *Id.* 1815; *see also Stive v. United States*, 366 F.3d 520, 522 (7th Cir. 2004) (interpreting wantonly to mean "recklessly making a frivolous claim").

citations omitted). The government's position, in short, impermissibly deviates from this court's precedent and the Supreme Court's rule.

Today's holding in no way lessens the necessarily stringent standards governing awards of attorneys' fees under the common law. *Batson*, 805 F.2d at 550 (citing *Roadway Express Inc. v. Piper*, 447 U.S. 752, 766, 100 S. Ct. 2455, 2463 (1980)). We emphasize that "[f]ee awards under section 2412(b) [ ] are not mandatory," and the bad faith exception is very narrow. *Baker*, 839 F.2d at 1080. "A party should not be penalized for maintaining an aggressive litigation posture," and a court should award fees only in extraordinary cases. *Batson*, 805 F.2d at 550. An attorneys' fee award "should not be assessed lightly or without fair notice and an opportunity for a hearing on the record." *Roadway Express*, 447 U.S. at 767, 100 S. Ct. at 2464.

This case, viewed in light of *Alyeska Pipeline* and our precedent, requires no unusual application of § 2412(b). The government's position here was poorly documented and legally dubious at the commencement of litigation. As the case evolved, even its tenuous legal basis eroded following the district court's adverse decision in a similar case and the revelation of Army Corps of Engineers' employment practices. The government's intransigence in spite of its legally deteriorating case, combined with extreme penalty demands and outrageous tactics, together support a bad faith finding. Thus, the government's bad faith is established under either our disjunctive or other circuits' conjunctive tests.

## B.

Second, in applying its unduly rigid test, the district court mistakenly focused solely on whether the government's position—that gate attendants are employees—was frivolous.[5] When a defendant requests fees, "the bad faith,

---

[5] The district court did cite cases involving fees awards for abusive or defiant litigation conduct. *Gate Guard I*, 2013 WL 3873275, at *6. But the court only analyzed whether the

vexation, wantonness, or oppression often relates to filing and maintaining the action." *Batson*, 805 F.2d at 550 (internal citation omitted). Consequently "courts may also award fees [ ] as a sanction for . . . bad faith in the conduct of the litigation resulting in an abuse of judicial process." *Id.*; *accord Roadway Express*, 447 U.S. at 766, 100 S. Ct. at 2464; *Hall*, 412 U.S. at 15, 93 S. Ct. at 1951. Therefore, "while the presence of merit in a claim or defense may negate any finding of bad faith in its filing, it cannot justify abuse of the judicial process in the method of prosecution." *Batson*, 805 F.2d at 850 (citing *Lipsig v. Nat'l Student Mktg. Corp.*, 663 F.2d 178, 182 (D.C. Cir. 1980)). By focusing solely on whether the government's claim that Gate Guard was violating the FLSA was colorable at the outset, the court ignored both that the case lost all "color" as it proceeded and the government's misconduct throughout this litigation.

### C.

With the foregoing principles in mind, there is no doubt that a bad faith award of attorneys' fees is appropriate. The government's conduct was oppressive and its case legally frivolous.

This court has upheld awards where the government has deliberately concealed information and consistently violated an agency's internal regulations. *Baker,* 839 F.2d at 1082; *Perales*, 950 F.2d at 1072. In private disputes, this court has found attorneys' fees justified when a party "engaged in dilatory tactics during discovery, refused to cooperate during depositions, [and] misused [ ] claim[s] of privilege." *Batson*, 805 F.2d at 551. Sadly, all these circumstances are present here.

This case is rife with the type of misconduct justifying an award of attorneys' fees under the EAJA's bad faith provision. Rapstine, the DOL's lead

---

FLSA enforcement action was frivolous. *See id.* The district court never discussed whether the government's conduct throughout this litigation justified an attorneys' fees award. *Id.*

investigator, deliberately shredded his notes or put them in a "burn barrel," thus impeding Gate Guard's ability to defend itself. Rapstine never explained why he destroyed evidence he knew would be relevant to this litigation. Rapstine also instigated an investigation he was unqualified to undertake, surprised a low-level Gate Guard employee when he knew the company's attorneys would not be present, came to a conclusion after interviewing just three witnesses, explained to a colleague after the opening conference that Gate Guard had "dug its own grave," inflated the damages calculations by approximately $4 million, and broke protocol in presenting his findings. Despite all of this, the government continued litigating the factually incomplete case Rapstine worked up.

The government's extraordinarily uncivil and costly litigation tactics strongly suggest that it hoped to prevail by oppressively pursuing a very weak case. The government opposed Gate Guard's reasonable and customary motions to transfer and consolidate for no viable reason. During discovery, the DOL refused to produce Rapstine's witness statements, even in redacted form, based on the government informant privilege, despite submitting portions of those statements to the court as evidence for its own purposes. To fill the gaps of Rapstine's incompetent investigation, the government began harassing gate attendants for more information. Last, but certainly not least, the government's lead counsel obstructed Rapstine's deposition so much, it had to be stopped. In a gross understatement, the court concluded that the "DOL failed to act in a reasonable manner both before and during the course of this litigation." *Gate Guard II*, 14 F. Supp. 3d at 839.

All of this left Gate Guard at a tremendous and unfair disadvantage. Without Rapstine's notes or witnesses statements, Gate Guard had no way of assessing its risk in this case or evaluating settlement potential. *Batson*, 805 F.2d at 551. Only by expending over $800,000 in attorneys' fees, wasting

countless hours of employees' time, and marshalling affidavits from ninety-four gate attendants was Gate Guard able to vindicate itself.   R. 9091; Appellee's Principal and Resp. Br. 7.  These expenditures were needless:

> Had the DOL interviewed more than just a handful of [Gate Guard's] roughly 400 gate attendants before presenting [Gate Guard] with a $6,000,000.00 demand and filing its Enforcement Action against [Gate Guard], it would have known the gate attendants were not employees.  Once discovery revealed the facts cited . . . above, the DOL should have abandoned this litigation.

*Gate Guard II*, 14 F. Supp. 3d at 839.   Instead of acting responsibly and abandoning the case, the government continued its prosecution, "despite overwhelming contradictory evidence." *Id.*

This view, with which we agree, is at odds with the district court's subsequent conclusion that the government's enforcement action was not frivolous.  The district court reasoned that because "as with most employee-status cases, there are facts pointing in both directions" and the FLSA claims were not "easily dispatched by cursory review of the evidence," the government's position was not frivolous.  *Gate Guard I*, 2013 WL 593418, at *7.  By the court's logic, a finding of frivolousness may be precluded whenever the relevant standard involves a fact intensive inquiry or a multi-factor balancing test.  This cannot be right.  A claim may be frivolous if the result of factual inquiries undeniably favors one party and no reasonable person could find otherwise.  Frivolousness should also take account of the government's duty, as prosecutor, to pursue only clearly meritorious enforcement actions.  That the employee-status test is fact intensive, therefore, does not preclude finding the government's position here was frivolous, even if some facts point in both directions.  As a result, we find that the government's position here was frivolous.

That the government had every reason to abandon this litigation is evident from many factors noted above, including: Rapstine's shoddy investigation, his destruction of material information, his many deviations from internal policy in pressing the charges, an intervening, contrary decision issued by the same court, and the evidence of Army Corps of Engineers' practices at odds with DOL's charges here. The litigation, even if colorable at the outset, soon was revealed as frivolous through the discovery process.

## CONCLUSION

The EAJA allows for an attorneys' fees award against the government whenever it has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *F.D. Rich*, 417 U.S. at 131, 94 S. Ct. at 2165. Although the most common situation will involve the government knowingly bringing a frivolous claim, a finding of legal frivolousness is not required. Here, the circumstances giving rise to an award included both the government's conduct before and during litigation as well as a legally insupportable case. The government's conduct here was sufficiently egregious to warrant an award under § 2412(b). For these reasons, we **REVERSE** and **REMAND** to the district court for calculation of attorneys' fees under § 2412(b).